**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

**SEEGER WEISS, LLP**
Christopher A. Seeger
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com

*Co-Liaison Counsel for Lead Plaintiff and the Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Andrew L. Zivitz
Matthew L. Mustokoff
Joshua E. D'Ancona
Margaret E. Mazzeo
Nathan A. Hasiuk
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jdancona@ktmc.com
mmazzeo@ktmc.com
nhasiuk@ktmc.com

*Lead Counsel for Lead Plaintiff and the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano
Adam H. Wierzbowski
Brenna D. Nelinson
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
salvatore@blbglaw.com
adam@blbglaw.com
brenna.nelinson@blbglaw.com

*Additional Counsel for the Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE CELGENE CORPORATION SECURITIES LITIGATION | Case No. 2:18-cv-04772 (JMV) (JBC)<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................4

    I.    Ozanimod .......................................................................................4

    II.    Otezla..............................................................................................8

ARGUMENT ..........................................................................................................10

    I.    Rule 23(a) Is Satisfied ....................................................................11

        A.    The Proposed Class Is Numerous ............................................11

        B.    The Proposed Class Shares Common Questions of Law
            and Fact .................................................................................13

        C.    Plaintiff's Claims Are Typical of the Class.............................14

        D.    Plaintiff and Proposed Class Counsel Are Adequate ...............16

            1.    Plaintiff's Interests Are Not Adverse to the Class .........16

            2.    Proposed Class Counsel Are Adequate and Satisfy
                Rule 23(g) ........................................................................18

    II.    Rule 23(b)(3)'s Requirements of Predominance and Superiority
        Are Satisfied ...........................................................................19

        A.    Common Questions Concerning Reliance and Damages
            Predominate ..........................................................................19

            1.    The *Cammer/Krogman* Factors Support a Finding
                of Market Efficiency.......................................................23

                a.    *Cammer* Factor One:  Weekly Trading
                    Volume ..................................................................24

                b.    *Cammer* Factor Two:  Wide Analyst
                      Coverage...............................................................25

c.  *Cammer* Factor Three:  Numerous Market Makers ............................................................. 26

d.  *Cammer* Factor Four:  Form S-3 Eligibility ......... 27

e.  *Cammer* Factor Five:  The Cause-and-Effect Relationship between Celgene-Specific News and Celgene's Stock Price .......................... 27

f.  Additional Factors Further Confirming Market Efficiency .................................................. 31

2.  The Class Is Entitled to a Presumption of Reliance Under *Affiliated Ute* ......................................... 34

3.  Damages Are Measurable Using a Common Methodology ................................................. 35

B.  Class Treatment Is Superior to Other Methods of Adjudication ....................................................... 37

III.  The Proposed Class Is Ascertainable ................................. 38

CONCLUSION ................................................................................. 39

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)......................................................................34, 35

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...............................................................17, 19, 20

*Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*,
    568 U.S. 455 (2013).....................................................................*passim*

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................... 3, 10, 21-22

*Beck v. Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006) ...............................................................19

*Bennett v. Sprint Nextel Corp.*,
    298 F.R.D. 498 (D. Kan. 2014) ..........................................................31

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................33

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015) ..............................................................38

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989)................................................*passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................28, 30

*Cheney v. Cyberguard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)...........................................31, 32, 33

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    2015 WL 5097883 (D.N.J. Aug. 31, 2015) .................................*passim*

*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*,
    795 F.3d 380 (3d Cir. 2015) ........................................................ 38-39

*In re Constar Int'l Inc. Sec. Litig.*,
    585 F.3d 774 (3d Cir. 2009) ........................................................................ 10-11

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) .........................................................................35

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008).................................................................*passim*

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011) ...............................................................................23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)....................................................................................3, 21

*Första AP-Fonden v. St. Jude Med., Inc.*,
    312 F.R.D. 511 (D. Minn. 2015) ................................................... 28, 30-31

*Gilbert v. Abercrombie & Fitch, Co.*,
    2016 WL 4159682 (S.D. Ohio Aug. 5, 2016) ....................................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)................................................................................10, 22

*In re Heckmann Corp. Sec. Litig.*,
    2013 WL 2456104 (D. Del. Jun. 6, 2013) .........................................................38

*Hull v. Glob. Dig. Sols., Inc.*,
    2018 WL 4380999 (D.N.J. Sept. 14, 2018) ......................................................24

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ...............................................................................34

*In re K-Dur Antitrust Litig.*,
    2008 WL 2699390 (D.N.J. Apr. 14, 2008) .......................................................16

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001)................................................................31, 32

*Li v. Aeterna Zentaris, Inc.*,
    2018 WL 1143174 (D.N.J. Feb. 28, 2018) .......................................................35

*Li v. Aeterna Zentaris, Inc.*,
324 F.R.D. 331 (D.N.J. 2018)................................................................................12

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
2013 WL 3486990 (S.D.N.Y. Jul. 11, 2013).......................................................18

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012)........................................................................33

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) ................................................................................12

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
2013 WL 396117 (D.N.J. Jan. 30, 2013).........................................10, 15, 16, 22

*In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*,
2012 WL 4482041 (D.N.J. Sept. 25, 2012).........................................14, 25, 27

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) ................................................................19, 20, 35, 37

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ................................................................ 16-17, 21

*In re Novo Nordisk Sec. Litig.*,
2020 WL 502176 (D.N.J. Jan. 31, 2020).........................................13, 14, 16, 36

*In re Ocean Power Tech., Inc.*,
2016 WL 6778218 (D.N.J. Nov. 15, 2016) ........................................................17

*In re Res. Am. Sec. Litig.*,
202 F.R.D. 177 (E.D. Pa. 2001)..........................................................................26

*Reyes v. Netdeposit, LLC*,
802 F.3d 469 (3d Cir. 2015) ................................................................................13

*Roofer's Pension Fund v. Papa*,
333 F.R.D. 66 (D.N.J. 2019).......................................................................*passim*

*In re Schering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009) ................................................................................15

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
   2012 WL 4482032 (D.N.J. Sept. 25, 2012) ..................................... 16, 17, 18-19

*Sharp v. Coopers & Lybrand*,
   83 F.R.D. 343 (E.D. Pa. 1979)..............................................................36

*Skeway v. China Nat. Gas, Inc.*,
   304 F.R.D. 467 (D. Del. 2014) ..................................................... 34-35

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001) ..............................................................12

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ..........................................21, 28, 36

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ..............................................................14

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ............................................................31

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ...............................................................22

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
   2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ................................*passim*

*Zinberg v. Wash. Bancorp, Inc.*,
   138 F.R.D. 397 (D.N.J. 1990)............................................................38

## Other Authorities

17 C.F.R. § 239.13 ...............................................................................27

17 C.F.R. § 240.10b-5(b) .....................................................................34

Fed. R. Civ. P. 23(a)........................................................11, 13, 14, 16

Fed. R. Civ. P. 23(b)(3).................................................................*passim*

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), Lead Plaintiff AMF Pensionsförsäkring AB ("AMF" or "Plaintiff") respectfully submits this memorandum of law in support of its Motion for Class Certification (the "Motion").

## PRELIMINARY STATEMENT

"[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc*., 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015).[1] This case is no exception.  Plaintiff moves for certification of a class consisting of all persons or entities who purchased the common stock of Celgene Corp. ("Celgene" or the "Company") between April 27, 2017 and April 27, 2018, inclusive (the "Class Period"), and were damaged thereby (the "Class").[2]

The numerosity and commonality requirements set forth in Rules 23(a)(1) and 23(a)(2), respectively, are plainly satisfied, as the Class is comprised of thousands of investors whose claims are brought under the same federal securities law, based

---

[1]   All internal citations and quotation marks are omitted and all emphasis is added, unless otherwise noted.  Citations to "Ex. __" are to exhibits attached to the accompanying Declaration of James E. Cecchi in Support of Lead Plaintiff's Motion for Class Certification.

[2]   Excluded from the Class are:  (i) Celgene; (ii) any directors and officers of Celgene during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of Celgene; (iv) any firm, trust, corporation or other entity in which Celgene has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

upon Defendants' common course of fraudulent conduct, and concern the same facts and elements of proof.  The Rule 23(a)(3) typicality requirement is also satisfied because Plaintiff, like all other Class members, suffered damages as a result of purchasing Celgene stock during the Class Period at prices that were artificially inflated by Defendants' material misrepresentations and omissions regarding two drugs central to future earnings in Celgene's Inflammation and Immunology ("I&I") franchise—Ozanimod and Otezla.  Defendants' statements were rendered materially false or misleading by their failure to disclose:  (i) the need for protracted testing of a metabolite that jeopardized Celgene's publicly announced timeline for submission of the Ozanimod New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA"), as well as the FDA's potential acceptance and approval of this filing; and (ii) the internally-recognized, substantial impediments to the expansion of the market for Otezla.

Rule 23(a)(4)'s adequacy requirement is also established, as Plaintiff:  (i) is the very type of institutional investor that is ideally suited to lead securities class actions under the Private Securities Litigation Reform Act of 1995 ("PSLRA"); (ii) understands its fiduciary duties to the Class, has actively prosecuted this case, and is committed to serving the best interests of the Class throughout this litigation; (iii) has retained adequate counsel, highly experienced in securities fraud and other complex class action litigation; and (iv) has no conflicts with other Class members.

There also can be no real dispute that common questions of law and fact predominate over questions affecting individual Class members, as required by Rule 23(b)(3).  The accompanying report of Plaintiff's expert, financial economist David I. Tabak, Ph.D. ("Dr. Tabak"), demonstrates that Celgene common stock traded in an efficient market during the Class Period, and therefore Plaintiff and the Class are entitled to rely on the fraud-on-the-market presumption of reliance.  *See* Ex. 1 (the "Tabak Report") ¶ 59; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (individual questions of reliance do not predominate where plaintiffs properly invoke the fraud-on-the-market theory); *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (same).  Dr. Tabak also confirms that a common methodology can be employed to measure damages for all Class members.  *See* Tabak Report ¶¶ 60-65.  Moreover, the class action device is the superior means of litigating Class members' claims because a class action is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and is least taxing on judicial resources.  *See* Fed. R. Civ. P. 23(b)(3).

Finally, proposed Class Counsel, Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz"), possesses the requisite experience and resources to prosecute this case as a class action through trial and any possible appeal.  For the reasons below, Plaintiff respectfully requests that the Court grant its Motion.

## STATEMENT OF FACTS[3]

Celgene is an integrated global biopharmaceutical company engaged primarily in the development and commercialization of therapies for the treatment of cancer and inflammatory diseases.  ¶ 64.  For years, Celgene's financial success was driven by its flagship drug, Revlimid, which accounted for approximately seventy percent of the Company's total annual product sales in 2010.  ¶ 99.  This outsized revenue stream is set to come to an end, however, when Celgene's Revlimid patent expires in 2022.  ¶ 101.  In order to assuage investor concern about the looming loss of revenues from Revlimid, Defendants engaged in a multifaceted scheme to prop up Celgene's stock price during the Class Period.  Defendants made material misrepresentations regarding two drugs that Defendants touted as sources of revenue to fill the void that would be left by Revlimid—Ozanimod and Otezla.  Specifically, Defendants misled investors regarding Ozanimod's testing data and NDA submission and the strength and soundness of the Otezla market.

## I.     OZANIMOD

The first facet of Defendants' scheme centered on Ozanimod, a development-stage drug for relapsing multiple sclerosis ("RMS") and ulcerative colitis ("UC") that Celgene acquired as the centerpiece of its $7.2 billion acquisition of Receptos

---

[3]   Unless otherwise noted:  (i) capitalized terms have the same meanings as in the Second Amended Consolidated Class Action Complaint (ECF No. 57) (the "Complaint"); and (ii) "¶ __" refers to paragraphs in the Complaint.

on July 14, 2015.  ¶¶ 65, 271.  Celgene projected annual Ozanimod sales of up to $6 billion upon approval from the FDA.  ¶¶ 270-71.  In October 2015, Celgene was dealt a critical blow when the U.S. Patent and Trademark Office invalidated the patent for competing RMS treatment Gilenya, allowing cheaper generic versions of Gilenya to enter the market by 2019.  ¶ 279.  As a result, Celgene came under immense pressure to obtain FDA approval of Ozanimod by 2018 in order to gain a market foothold prior to the influx of less expensive Gilenya generics.  ¶¶ 279-80.

Against this backdrop, and beginning before the start of the Class Period, Defendants Celgene, Philippe Martin, and Scott Smith repeatedly represented that Celgene was on track to seek regulatory approval for Ozanimod in late 2017, based on the Company's successful Phase III clinical trials.  ¶¶ 430-33, 439-45, 447-55.  Unbeknownst to investors, however, Celgene had ignored bedrock FDA guidance and proceeded with Phase III trials, despite the fact that Celgene had not yet performed necessary Phase I testing, including the "gold standard" Mass Balance Study.  ¶¶ 293-94.  When Celgene belatedly conducted the Phase I Mass Balance Study, this test revealed, by November 2016 at the latest, the presence of a highly active metabolite that would become the subject of significant FDA concern (the "Metabolite").  ¶¶ 297-98, 300, 333.  Given the Metabolite's characteristics, including a disproportionate presence in humans, high concentration, and extended

half-life, Defendants knew that extensive additional Phase I testing was necessary before submission of the NDA.  ¶¶ 300-02, 333.

Internally, Celgene scientists recognized that if the Company opted to file the NDA without the completed Phase I test results, a "refuse to file" letter ("RTF") rejecting the NDA was all but certain.  ¶¶ 313-14.  At a meeting in March or April 2017 attended by Defendant Martin, Receptos' Head of Clinical Pharmacology confirmed that additional testing of the Metabolite was necessary.  ¶¶ 304-05.  The Court acknowledged the significance of this meeting in its December 19, 2019 Opinion denying Defendants' motion to dismiss, finding that by April 2017, "Celgene had discovered the Metabolite, knew that additional testing was required, and that the Metabolite compromised the safety and efficacy profile of Ozanimod." ECF No. 75 ("Opinion") at 38.  The Court also found that the Complaint adequately alleged that both Martin and Smith were aware of the Metabolite by April 2017.  *Id.* at 44.  Despite knowing that further Phase I metabolite testing was required, Celgene and Smith misleadingly represented in April 27, 2017 filings with the SEC and during an earnings call that same day that Ozanimod was in "phase III trials," top-line Phase III results were positive, and that they anticipated "filing [ ] for regulatory approval by year-end."  ¶¶ 306, 430-32.

Underscoring what Celgene already knew, the FDA expressly informed the Company that it needed to complete further testing of the Metabolite prior to

submission of the Ozanimod NDA.   ¶¶ 316-17.   Notwithstanding this explicit directive from the FDA and despite the acknowledgement within the Company that the failure to conduct necessary additional Phase I testing jeopardized Celgene's publicly-disclosed timeline for the NDA, Defendants continued to misrepresent that Ozanimod was in "Phase III" development, and that the NDA was "on track for regulatory submission" by the end of 2017, pending only the results of the Phase III trials.   ¶¶ 449, 461-65.   None of Celgene's public disclosures warned of the near certainty that the FDA would reject the NDA without the completed Metabolite testing.

As the self-imposed NDA filing deadline neared, another drug in the Revlimid replacement pipeline, GED-0301, was proving to be a complete failure.   On October 19, 2017, after almost two years of development, Celgene publicly admitted that GED-0301 did not work, and disclosed that the GED-0301 Phase III trial would be discontinued and that Celgene would recognize a $1.6 billion impairment of the failed asset for a pre-tax charge to earnings of up to $500 million.   ¶ 32.   Motivated by the need to make Ozanimod successful in the wake of the GED-0301 failure, the desire to gain market penetration for Ozanimod prior to the introduction of Gilenya generics, and the lucrative bonuses and performance awards that Martin and other Celgene executives would receive upon submission of the NDA, Celgene disregarded its own employees' concerns and the FDA's express directive, and opted

to risk an RTF by filing the NDA in December 2017 without having completed the required Metabolite tests.  ¶¶ 312, 318-21.

In subsequent weeks, Defendants repeatedly touted the submission of the NDA and continued to conceal their discovery of the Metabolite, the FDA's directive to conduct additional tests, and the outstanding incomplete Phase I testing. ¶ 322; *see also* ¶¶ 461-65.  On February 27, 2018, Celgene disclosed that the FDA had issued an RTF, demonstrating that the NDA was facially deficient and that the FDA would not even review it—a rare rebuke for a major pharmaceutical company. ¶¶ 323, 326.  The news shocked the market, causing Celgene's common stock price to fall by $8.66 per share.  ¶¶ 330, 489-94.  On April 25, 2018, Celgene disclosed the existence of the Metabolite and that it was responsible for "the majority of the total activity of ozanimod in humans."  ¶ 331.  Additional information regarding the Metabolite and the likely delay that would result from follow-on testing was revealed on April 29, 2018 and Celgene's common stock price dropped from a close of $91.18 on April 27, 2018, to a close of $87.10 on April 30, 2018.  ¶¶ 499-502.

## II.    OTEZLA

The second facet of Defendants' scheme revolved around Otezla, a drug used to treat psoriasis and psoriatic arthritis.  ¶ 6.  On January 12, 2015, Celgene announced its five-year strategic growth plan and promoted Otezla as driving the Company's growth, projecting $1.5 billion to $2 billion in net Otezla sales by 2017.

¶¶ 207, 381.  Over the next two years, despite receiving repeated internal warnings that achieving this guidance was impossible, Defendants repeatedly reaffirmed it, and represented not only that Otezla would achieve its 2017 sales targets, but that the conditions necessary for Otezla to attain these targets existed.  ¶¶ 231-33, 384, 386-93, 395, 397-402, 405-13.  Consistent with this refrain, on April 27, 2017, the first day of the Class Period, Defendant Terrie Curran reaffirmed the 2017 guidance and represented that the "underlying dynamics" of the Otezla market were "exceptionally strong," referencing Otezla's purported traction with new patients and the Company's ability to access an additional "pool of patients moving forward" due to "new contracts."  ¶ 409.

In truth, the underlying dynamics for the Otezla market were anything but strong, as numerous barriers prevented Otezla from gaining market share.  These issues, which included the Company's poor pricing strategy for Otezla, the drug's inferior efficacy, the saturation of competitor drugs, poor insurance coverage, and limited patient access, were known and discussed internally at Celgene months before Defendant Curran's misstatement to investors.  ¶¶ 209-30.  During Celgene's IIEC meetings in the third and fourth quarter of 2016, attended by Curran, Celgene employees raised concerns regarding the lack of growth in Otezla sales and the impediments to growing market share for the drug.  ¶¶ 235-37.  In fact, a senior executive in Celgene's U.S. Market Access Group expressly advised the IIEC in the

fourth quarter of 2016 that the Company's 2017 Otezla sales guidance should be lowered.  ¶ 237.  Rather than heed these warnings, Defendant Curran told the forecasting team to falsely change the numbers for the internal forecasts.  ¶ 238.

On October 26, 2017, the truth about the floundering Otezla market came to light when Celgene reported third quarter 2017 Otezla revenues of only $308 million and finally admitted that Celgene would not meet its 2017 Otezla guidance, reducing the low end of the guidance by more than $250 million.  ¶¶ 263, 478.  This "big miss" (long foreseen internally at Celgene) led investors to "substantially alter[]" their "outlook" and caused a 16% decline in Celgene's common stock price.  ¶¶ 267-69, 478-88.

## ARGUMENT

"[F]ederal securities actions are 'well suited' for litigation under Rule 23." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013).  The Supreme Court has repeatedly emphasized the importance of the class action device in rectifying wrongdoing under the federal securities laws. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267-68 (2014) ("*Halliburton II*"); *Basic*, 485 U.S. at 249.

Class certification is appropriate where the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied by a preponderance of the evidence. *See Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459 (2013); *In re*

*Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009).  Rule 23(a) has four

prerequisites—numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P.

23(a)(1)-(4).  Rule 23(b)(3) requires that common questions "predominate over any

questions affecting only individual members, and that a class action is superior to

other available methods for fairly and efficiently adjudicating the controversy."  Fed.

R. Civ. P. 23(b)(3).

As the Supreme Court has made clear, the relevant inquiry at the class-

certification stage is not whether the plaintiff will ultimately prevail on the merits,

but whether the requirements of Rule 23 are met.  *See Amgen*, 568 U.S. at 465-66

("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the

class certification stage.").  Thus, "[m]erits questions may be considered to the

extent—***but only to the extent***—that they are relevant to determining whether the

Rule 23 prerequisites for class certification are satisfied."  *Id*. at 466.

## I.      RULE 23(a) IS SATISFIED

The proposed Class satisfies the numerosity, commonality, typicality, and

adequacy prerequisites of Rule 23(a).  *See* Fed. R. Civ. P. 23(a)(1)-(4).

### A.     The Proposed Class Is Numerous

Rule 23(a)(1)'s numerosity requirement is met here because the members of

the proposed Class are so numerous that joinder of all members is impracticable.

Fed. R. Civ. P. 23(a)(1).  To establish numerosity, a plaintiff is not required to "offer

direct evidence of the exact number and identities of the class members." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012). Instead, "circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition" is sufficient. *Id.* Moreover, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001); *see Merck*, 2013 WL 396117, at *3.

The proposed Class readily satisfies the numerosity requirement. *First*, throughout the Class Period, Celgene's securities traded on the NASDAQ, "one of the most open, developed, and efficient exchanges in the world." Tabak Report ¶¶ 27, 48. *Second*, there was an average of approximately 775 million shares of Celgene common stock outstanding during the Class Period. Tabak Report Ex. 3, p. 2. *Third*, more than 1,800 institutional investors purchased or otherwise acquired Celgene common stock during the Class Period. Tabak Report ¶ 29. These facts easily establish numerosity. *See Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019) (numerosity satisfied where "Aeterna's stock was actively traded on the NASDAQ stock exchange during the class period"); *W. Palm Beach Police*

*Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *7 (E.D. Pa. Aug. 4, 2016) (numerosity satisfied where millions of shares were outstanding).

## B.   The Proposed Class Shares Common Questions of Law and Fact

The Rule 23(a)(2) commonality requirement is met where, as here, there are "questions of law or fact common to the class."   Fed. R. Civ. P. 23(a)(2).   The commonality requirement, which is "not particularly demanding," *Prudential*, 2015 WL 5097883, at *8, is satisfied where the proposed class representatives share "at least one question of fact or law with the grievances of the prospective class."   *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *see also In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *5 (D.N.J. Jan. 31, 2020) ("*Novo*") (same) (citing *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009)).

"Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock."   *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74-75 (D.N.J. 2019).   This case is no different.   Questions common to all Class members include, among other things:   (i) whether Defendants violated the federal securities laws; (ii) whether Defendants' public statements during the Class Period misrepresented or omitted material facts; (iii) whether Defendants acted with scienter in issuing false and misleading statements; and (iv) whether the price of Celgene common stock was

artificially inflated by Defendants' statements.  These issues of both law and fact common to all Class members satisfy Rule 23(a)(2)'s commonality requirement. *See, e.g.*, *Novo*, 2020 WL 502176, at *5 (commonality established where "[c]omplaint alleges a common course of conduct arising from materially false and misleading statements and omissions Defendants made to the investing public").

Moreover, class certification is appropriate here because these common questions will "generate common answers apt to drive the resolution of the litigation."  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 299 (3d Cir. 2011); *see also In re Merck & Co., Inc., Vytorin/Zetia Sec. Litig.*, 2012 WL 4482041, at *4 (D.N.J. Sept. 25, 2012) ("questions of misrepresentation, materiality and scienter are the paradigmatic common question[s] of law or fact") (alteration in original).  Thus, the commonality prerequisite is satisfied.

### C.    Plaintiff's Claims Are Typical of the Class

Because Plaintiff's claims are "typical" of the claims of the proposed Class, Rule 23(a)(3)'s typicality requirement is satisfied.  Fed. R. Civ. P. 23(a)(3).  "The standard for demonstrating typicality is undemanding and requires that 'the claims of the named plaintiffs and putative class members involve the same conduct by the defendant.'"  *Papa*, 333 F.R.D. at 75 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)).  Rule 23(a)(3) "does not require that the putative class members all share identical claims."  *Id*. at 75

(citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004)); *see also Schering Plough*, 589 F.3d at 598 ("Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence.").

The requisite similarity between Plaintiff's claims and those of other Class members is established here, as Plaintiff and all other Class members assert the same claims under the federal securities laws based on the same conduct by Defendants. Specifically, Plaintiff and the other members of the Class allege that Defendants made misrepresentations and omissions during the Class Period regarding Ozanimod and Otezla. Moreover, the injury Plaintiff suffered is the same injury suffered by the Class as a whole, as all Class members—including Plaintiff—purchased or acquired Celgene common stock at prices that were artificially inflated by Defendants' fraud. *See* Tabak Report ¶¶ 61, 65; *see also Merck*, 2013 WL 396117, at *6 (typicality established where "[t]he class claims . . . arise out of the same conduct—transactions in Merck securities that were based on an allegedly artificially inflated stock price as a result of Defendants' misrepresentations and omissions concerning the safety profile of Vioxx").

In sum, typicality is satisfied because "Plaintiff['s] claims arise from the very same alleged Exchange Act violations as those that give rise to the claims of the

absent class members." *Id.* at *5; *see also Novo*, 2020 WL 502176, at *6 ("[T]ypicality is clearly satisfied because Plaintiffs' claims arise from the same course of conduct that gave rise to the claims of all other Class members and are based on the same legal theory.").

### D. Plaintiff and Proposed Class Counsel Are Adequate

Rule 23(a)(4) requires a showing that "the representative part[y] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement has two prongs: (i) "the class representatives' interests are not adverse to those of other members of the class"; and (ii) "the class representative is represented by attorneys who are qualified, experienced, and generally able to conduct the litigation." *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *6 (D.N.J. Sept. 25, 2012). To preclude class certification, an alleged conflict of interest between the class representative and other class members "must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re K-Dur Antitrust Litig.*, 2008 WL 2699390, at *9 (D.N.J. Apr. 14, 2008).

### 1. Plaintiff's Interests Are Not Adverse to the Class

Similar to the typicality and commonality inquiries, the adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Schering-Plough*, 2012 WL 4482032, at *6; *see also Newton*,

259 F.3d at 185-86 ("the commonality and typicality criteria tend to merge into an analysis of adequacy of representation under Fed. R. Civ. P. 23(a)").  The crux of this inquiry is whether the proposed class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997).  However, the adequacy requirement "does not mandate that the interests of all class members be identical." *Schering-Plough*, 2012 WL 4482032, at *6.

Here, Plaintiff "possess[es] the same interest and suffer[ed] the same injury as the class members" and, thus, there are no fundamental conflicts between Plaintiff and the Class.  *In re Ocean Power Tech., Inc.*, 2016 WL 6778218, at *7 (D.N.J. Nov. 15, 2016).  Like all Class members, Plaintiff purchased Celgene common stock at artificially inflated market prices during the Class Period and was injured by Defendants' misconduct.  ¶ 63.  In establishing Defendants' liability and maximizing Plaintiff's recovery, Plaintiff will necessarily do the same for the other Class members.  *See Schering-Plough*, 2012 WL 4482032, at *6 (adequacy established where plaintiffs "purchased Schering securities during the Class Period and have been injured by the allegedly wrongful course of conduct at issue").

In addition, Plaintiff has been actively overseeing and involved in the litigation of this Action since its appointment as Lead Plaintiff, demonstrating its willingness and ability to serve as a Class Representative.  *See* Ex. 2 (Declaration of

Anders Grefberg).  Plaintiff is a large institutional investor that understands its fiduciary duties to the Class.  To date, Plaintiff has, among other things, received and reviewed periodic updates and other correspondence from counsel, participated in discussions with counsel regarding case strategy, discovery, and significant developments in the litigation, and reviewed drafts of filings and discovery responses.  *See, e.g.*, *DFC Global*, 2016 WL 4138613, at *9-10 (lead plaintiff adequate where it communicated regularly with counsel, reviewed filings before submission, and aided counsel in responding to discovery).

### 2.   Proposed Class Counsel Are Adequate and Satisfy Rule 23(g)

The second prong of the adequacy requirement also is satisfied because Plaintiff has retained experienced counsel to represent the Class.  *See* Ex. 3 (Firm Resume of Kessler Topaz).  Courts have recognized Kessler Topaz as "highly qualified," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2013 WL 3486990, at *2 (S.D.N.Y. Jul. 11, 2013), and "skilled in shareholder and transactional litigation, focusing on such a practice over the past 24 years." *Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at *6 (S.D. Ohio Aug. 5, 2016).[4]  Plaintiff and its counsel thus satisfy the adequacy requirement.

---

[4]   Kessler Topaz has enlisted Bernstein Litowitz Berger & Grossmann LLP as additional counsel for the Class.  Another court in this District recognized that there is "no doubt" Bernstein Litowitz is "qualified, experienced, and generally able to conduct [securities class action] litigation." *Schering-Plough*, 2012 WL 4482032,

## II.    RULE 23(b)(3)'S REQUIREMENTS OF PREDOMINANCE AND SUPERIORITY ARE SATISFIED

In addition to satisfying the prerequisites of Rule 23(a), Plaintiff must also show that the proposed class action satisfies one of the Rule 23(b) subsections.  Here, Plaintiff seeks certification under Rule 23(b)(3), which provides that certification is appropriate where common questions of law or fact predominate over individual questions, and a class action is superior to other available means of adjudication. *See* Fed. R. Civ. P. 23(b)(3); *see also Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006).  Both requirements are satisfied.

### A.    Common Questions Concerning Reliance and Damages Predominate

"The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  Where common questions of law or fact outnumber those affecting only individual class members, predominance is satisfied. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015); *see also Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.")

at *6.  In addition, Kessler Topaz has engaged Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. ("Carella Byrne") and Seeger Weiss, LLP ("Seeger Weiss") to serve as Liaison Counsel for the Class.

- 19 -

(emphasis in original).  Common questions may predominate even where differences between class members exist.  *Neale*, 794 F.3d at 371.

"[T]he predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues." *Papa*, 333 F.R.D. at 78-79.  Securities fraud suits are particularly well suited to a finding of predominance, as they stem from a common course of conduct and allege a common harm.  *Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").  Nothing here warrants deviating from this principle.

The elements of Plaintiff's Section 10(b) claim are:   "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."   *Amgen*, 568 U.S. at 460-61.  Falsity, scienter, materiality, and loss causation are indisputably issues common to the Class because "failure of proof" on any of these elements "would end the case" for all Class members.  *See id.* at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)") (alteration in original); *id.* at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be

adjudicated before a class is certified"); *see also Halliburton I*, 563 U.S. at 813 (plaintiff need not prove loss causation at class certification).

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810; *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ("Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts surrounding the fraudulent misrepresentation of material facts and the causal relationship between the correction of that misrepresentation and the price of the security."). Reliance here will also be proven with evidence common to the Class, as Plaintiff and the Class satisfy all of the prerequisites for applying the presumption of reliance under the fraud-on-the-market theory.

Under the fraud-on-the-market theory, "[r]eliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market." *Newton*, 259 F.3d at 175 (citing *Basic*, 485 U.S. at 241-42). This presumption obviates the need for individualized showings of reliance by each Class member. The premise of the fraud-on-the-market theory is that, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . .

Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241-42; *see also Halliburton II*, 573 U.S. at 270 ("'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'") (quoting *Basic*, 485 U.S. at 246); *Amgen*, 568 U.S. at 466 ("in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price"). As a result, "'reliance on any public material misrepresentations . . . may be ***presumed*** for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).

To invoke the presumption of reliance at this stage, a plaintiff need only show that:  (i) the alleged misrepresentations were publicly known; (ii) the plaintiff traded in the stock between the making of those misrepresentations and the alleged revelation of the truth; and (iii) the stock at issue traded in an efficient market. *Halliburton II*, 573 U.S. at 277-78; *Merck*, 2013 WL 396117, at *12; *see also Amgen*, 568 U.S. at 470 (plaintiffs need not establish materiality at class certification).  With respect to the required showing of an efficient market, "the Supreme Court has suggested that the burden required to establish market efficiency is not an onerous one." *Waggoner*, 875 F.3d at 97.

Each of the necessary prerequisites to invoke the fraud-on-the-market presumption is satisfied here.  *First*, Defendants' alleged misrepresentations were public statements made to the market at large.  *Second*, Plaintiff and all other members of the Class purchased Celgene stock during the Class Period, between the date of the first alleged misrepresentation and the alleged revelation of Defendants' fraudulent conduct.  *Third*, as discussed below and in the Tabak Report, Celgene common stock traded in an efficient market during the Class Period.

As an initial matter, Celgene common stock traded on the NASDAQ throughout the Class Period (*see* Tabak Report ¶¶ 27, 48), which the Third Circuit has held presents convincing evidence of an efficient market.  *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[s]ecurities markets like the . . . NASDAQ are open and developed . . . and are therefore well suited for application of the fraud on the market theory"); *see also DFC Global*, 2016 WL 4138613, at *12 (holding that NASDAQ is an efficient market and collecting cases).  While this fact alone warrants a finding of market efficiency, the additional indicia of an efficient market are also present here.

### 1. The *Cammer/Krogman* Factors Support a Finding of Market Efficiency

District courts in this Circuit regularly assess market efficiency by applying the *Cammer* factors, which consist of:  "(1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the

company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price." *Prudential*, 2015 WL 5097883, at \*6 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).  However, "[c]ourts should not view these factors as a checklist that a plaintiff must pass in order to plead market efficiency, but rather should use them as an analytical tool to assist in its analysis." *Hull v. Glob. Dig. Sols., Inc.*, 2018 WL 4380999, at \*6 (D.N.J. Sept. 14, 2018).

### a.   *Cammer* Factor One:  Weekly Trading Volume

A high weekly trading volume is indicative of market efficiency because it "implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286; *see also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008) (same).

During the Class Period, Celgene common stock traded in an active market, with an average weekly turnover (i.e., trading volume) adjusted for market maker participation of 1.68 percent per week.  Tabak Report ¶ 22.[5]  This turnover rate of

---

[5]   Without this conservative adjustment for market-maker participation, the average weekly trading volume is "more than twice as large" (Tabak Report ¶ 22), far exceeding the two-percent threshold for average weekly trading volume that

more than 1 percent supports a "substantial presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286 ("one percent [turnover] would justify a substantial presumption"); *see also* Tabak Report ¶ 22 ("the volume figures for Celgene's stock support a 'substantial presumption' in favor of market efficiency").

### b. *Cammer* Factor Two:  Wide Analyst Coverage

"Extensive coverage by securities analysts likewise indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis." *DVI*, 249 F.R.D. at 209 (citing *Cammer*, 711 F. Supp. at 1286).  Here, numerous analysts—an average of 25—covered Celgene during the Class Period.  Tabak Report ¶ 25.  Moreover, there were at least 22 analysts from leading financial institutions like Bank of America Merrill Lynch, Citibank, Credit Suisse, Deutsche Bank, JP Morgan, Morgan Stanley, UBS Equities, and Wells Fargo who issued one or more reports each month.  Tabak Report ¶ 26 & n.19.  This significant analyst coverage supports a finding of market efficiency.  *See Merck/Vytorin*, 2012 WL 4482041, at *5 (coverage by "well known firms such as A.G. Edwards, Bear Stearns, Citibank, JP Morgan, and Merrill Lynch" weighed in favor of market efficiency);

---

*Cammer* indicated "would justify a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286; *see also Papa*, 333 F.R.D. at 81 ("[T]rading volume of two percent or more justifies a strong presumption of market efficiency.").

*DVI*, 249 F.R.D. at 210 (coverage by three analysts "sufficient to favor a finding of market efficiency").

### c. *Cammer* Factor Three:  Numerous Market Makers

The presence of market makers and arbitrageurs also supports a finding of market efficiency, as these market participants "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87.  During the Class Period, there were 152 market makers who traded Celgene common stock.  Tabak Report ¶ 27.  Moreover, 82.8 percent of the more than 1,800 institutions holding Celgene common stock during the Class Period were not passive investors, and instead changed their positions in Celgene stock, a hallmark of arbitrage activity.  *Id.* ¶ 30.  As Dr. Tabak explains, the number of institutional investors can be used as a proxy for arbitrageurs, as "one would expect many of the arbitrageurs who are active enough to move the market to be found among the largest market participants." *Id*. ¶ 28.[6]   The presence of these numerous market makers and arbitrageurs for Celgene common stock is indicative of an efficient market.  *See, e.g.*, *In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 189 (E.D. Pa. 2001) (presence of at least four market makers during class period indicative of efficient market).

---

[6]   Arbitrageurs are investors who try to profit from any possible mispricing of a security.  *Id*. ¶ 28.

### d.   *Cammer* Factor Four:  Form S-3 Eligibility

A company's eligibility to file a Form S-3 Registration Statement with the SEC is indicative of market efficiency because the ability to file these forms indicates that the company is easily able to issue new securities.  *DVI*, 249 F.R.D. at 210 & n.23.  A company is eligible to file a Form S-3 Registration Statement if it has filed SEC reports for 12 consecutive months and has at least $75 million of float.  *See* 17 C.F.R. § 239.13.  Throughout the Class Period, Celgene met the requirements for issuing securities pursuant to a Form S-3 Registration Statement; indeed, throughout the Class Period, Celgene's float exceeded $63 billion.  Tabak Report ¶¶ 33-34.  Thus, this factor also weighs in favor of finding market efficiency.  *Id.* ¶ 34; *see, e.g.*, *Merck/Vytorin*, 2012 WL 4482041 at *5 (finding that market was efficient and plaintiffs were entitled to presumption of reliance based in part on defendant company's eligibility to file Form S-3 during class period).

### e.   *Cammer* Factor Five:  The Cause-and-Effect Relationship between Celgene-Specific News and Celgene's Stock Price

The fifth *Cammer* factor examines whether a plaintiff can illustrate "over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  While "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," empirical evidence of a cause and effect relationship between corporate

news events and a company's share-price movements supports a finding of market efficiency. *DFC Global*, 2016 WL 4138613, at \*12; *see also id.* at \*13 (market efficiency does not require that this factor or any other single *Cammer* factor be satisfied); *Strougo*, 312 F.R.D. at 320 (rejecting argument that fifth *Cammer* factor was necessary to demonstrate efficiency); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83-84 (S.D.N.Y. 2015) (same); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 520 (D. Minn. 2015) (same).

Using statistical analyses based on an event study, Dr. Tabak found clear evidence of a cause-and-effect relationship between the price of Celgene common stock and news regarding the Company during the Class Period. Tabak Report ¶¶ 35-47; *id*. Exs. 8a-8d; *see also DFC Global*, 2016 WL 4138613, at \*13 (quoting *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010)) (event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price"). "[T]here is no dispute that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by the fifth *Cammer* factor. *Prudential*, 2015 WL 5097883, at \*6.

As detailed in his report, Dr. Tabak performed five different objective statistical analyses to test for a cause-and-effect relationship between Company-specific news and Celgene stock price movements. Tabak Report ¶¶ 36-47. Dr.

Tabak found that four of these five tests yielded strong evidence of such a relationship, while the fifth lacked adequate data from which to draw a meaningful statistical conclusion. *Id.* Each of these tests compared the percentage of days with Company-related news ("news days") that had statistically significant stock price movements to the percentage of days without corporate news ("non-news days") that had statistically significant stock price movements. *Id.* ¶¶ 39-46. Dr. Tabak employed different objective criteria to identify news days in each test. *Id.*

The results from all four of Dr. Tabak's analyses with sufficient data points to be useful in evaluating market efficiency showed a statistically significant difference between (i) the percentage of news days with statistically significant stock price movements and (ii) the percentage of non-news days with such movements, at the commonly-used five-percent level. *Id.* ¶¶ 40-47. For example, when Dr. Tabak defined news days as days with stories published on the *Dow Jones Newswires* that mentioned Celgene in the headline or in the lead paragraph, twelve (12) of the 109 news days, or 11.0 percent, had statistically significant stock price movements, while only four (4) of the 144 non-news days, or 2.8 percent, had statistically significant returns. Tabak Report ¶¶ 40-41, Ex. 8a. The difference between the 11.0 percent of news days and 2.8 percent of non-news days with statistically significant stock price returns was statistically significant. *Id.* In each of three further analyses Dr. Tabak performed, in which he defined news days using different objective criteria, the

results likewise showed a statistically significant difference in the percentage of news days with statistically significant price movements versus the percentage of non-news days with such stock price changes. *Id.*[7] While Dr. Tabak did not find a statistically significant difference between percentages for news days and non-news days in one of the five tests that he performed (in which news days were defined as Celgene earnings announcements), he explained that this test suffered from low statistical power, because there were only four earnings days—and hence insufficient data from which to draw robust statistical conclusions—during the period in question. *Id.* ¶ 39, Ex. 8a.

Based on all of the results of all of these tests, Dr. Tabak concluded that his analyses "provide strong evidence that Celgene's stock price responded to material new information." *Id.* ¶ 47. This conclusion is in accord with the findings of other courts when faced with similar statistical analyses and results. *See, e.g.*, *Carpenters*, 310 F.R.D. at 92 (fifth *Cammer* factor satisfied where five of fifteen news days exhibited statistically significant returns); *St. Jude*, 312 F.R.D. at 521 (analysis concluding that "the difference between statistically significant news days and non-

---

[7]   The percentage of news days versus non-news days with statistically significant stock price movements generated by these analyses was 19.6 percent versus 3.0 percent, 53.8 percent versus 3.8 percent, and 50.0 percent versus 4.1 percent, respectively. *Id.*

news days was itself statistically significant" establishes "*some* cause-and-effect relationship between news and stock price") (emphasis in original).

Accordingly, each of the *Cammer* factors supports a finding that the market for Celgene common stock was efficient during the Class Period.

### f.    Additional Factors Further Confirming Market Efficiency

In addition to the *Cammer* factors, courts in this Circuit and elsewhere have considered whether the factors identified in the *Unger* and *Krogman* decisions support a finding of market efficiency.  *See Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001). These factors include:  (i) the size of the company's market capitalization, which is measured by multiplying shares outstanding by their prevailing price; (ii) the "float," or the percentage of shares held by the public, as opposed to corporate insiders; and (iii) investors' ability to short-sell a security.  *See, e.g.*, *DVI*, 249 F.R.D. at 208 (citing *Krogman*, 202 F.R.D. at 477-78).  Moreover, courts often assess the bid-ask spread of the security and the number of institutional investors holding that security. *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 511 (D. Kan. 2014).  Finally, courts also look for autocorrelation in a security's trading returns, i.e., the degree to which returns on one trading day predict returns on the next trading day, higher levels of which may reflect an inefficient market.  *DVI*, 249 F.R.D. at 213.  Dr. Tabak's assessment of

each of these additional factors also weighs in favor of a market efficiency finding. Tabak Report ¶¶ 31-32, 49-58.

   ***Market Capitalization.***  "'Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.'"  *DVI*, 249 F.R.D. at 212 (quoting *Krogman*, 202 F.R.D. at 478).  During the Class Period, Celgene's market capitalization was at least $63 billion.  Tabak Report ¶ 49.  This large market capitalization supports a finding of market efficiency.  *Id.* ¶ 50; *see also DVI*, 249 F.R.D. at 212 (market capitalization ranging between $12 million to $300 million indicative of market efficiency).

   ***Bid-Ask Spread.***  The bid-ask spread is "the difference between the price that potential buyers are willing to pay and the price at which potential sellers are willing to sell."  *Prudential*, 2015 WL 5097883, at *6.  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."  *Krogman*, 202 F.R.D. at 478.  Celgene's low bid-ask spread, which averaged 0.02 percent of the stock's price over the Class Period, supports a finding of market efficiency.  Tabak Report ¶ 52; *cf. Cheney*, 213 F.R.D. at 501 (finding bid-ask spread of 2.44 percent weighed in favor of market efficiency).

   ***Public Float and Institutional Ownership.***  During the Class Period, nearly all of Celgene's common stock—on average, over 99%—was held by non-insiders,

and on average, institutional investors held 79.63% of the shares outstanding during a given quarter. Tabak Report ¶ 53, Exs. 5, 7. These findings support market efficiency. *See Cheney*, 213 F.R.D at 502 (95% float indicative of market efficiency); *Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012) (institutional holdings of 29% to 71% of outstanding shares supported efficiency); *DVI*, 249 F.R.D. at 215 & n.35 (institutional investors' holding of over 90% of securities at issue was evidence of market efficiency).

*Autocorrelation and Short Selling.* Dr. Tabak's analysis of autocorrelation and short selling in Celgene common stock also supports a finding of market efficiency. Dr. Tabak looked at the degree of "autocorrelation," i.e., whether there is a predictable statistical pattern of positive and negative changes in the price of Celgene common stock and found no statistically significant degree of autocorrelation. *See* Tabak Report ¶¶ 54-58; *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160-63 (S.D.N.Y. 2012) (lack of serial autocorrelation supports weak form of efficient-market hypothesis and finding of market efficiency). Finally, there were substantial changes in the amount of short interest during the Class Period, indicating the lack of any notable constraints on short-selling of Celgene's common stock. *See* Tabak Report ¶¶ 31-32.

Taken together, each of the five *Cammer* factors, as well as the additional factors that courts in this Circuit have commonly employed in evaluating market

efficiency, supports the conclusion that Celgene common stock traded in an efficient market throughout the Class Period.  *See* Tabak Report ¶ 59.  Plaintiff and the Class are thus entitled to invoke the fraud-on-the-market presumption of reliance.

### 2. The Class Is Entitled to a Presumption of Reliance Under *Affiliated Ute*

In addition to the fraud-on-the-market presumption, reliance is also presumed under *Affiliated Ute* because Plaintiff's claims are premised on the omission of material information from Defendants' disclosures.  *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001).  In such cases, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material[.]"  *Affiliated Ute*, 406 U.S. at 153.

The Court need not address this issue if it finds, as Plaintiff submits it should, that reliance is presumed under the fraud-on-the-market theory.  However, to the extent necessary, reliance can also be presumed under *Affiliated Ute* because Plaintiff's allegations are premised on Defendants' failure to disclose material facts to investors, including the impact of the Metabolite's discovery on Celgene's NDA and the impediments to growing market share for Otezla.  ¶¶ 415, 435, 459.  Because Defendants failed to disclose facts "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5(b), the *Affiliated Ute* presumption applies.  *See Skeway v. China*

*Nat. Gas, Inc.*, 304 F.R.D. 467, 475 (D. Del. 2014) (applying *Affiliated Ute* where securities claims "involve[d] primarily a failure to disclose"); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269-70 (S.D.N.Y. 2014) (same).

### 3.    Damages Are Measurable Using a Common Methodology

"Plaintiffs are *not required* to produce a detailed damages model" at the class certification stage.  *Li v. Aeterna Zentaris, Inc.*, 2018 WL 1143174, at *2 (D.N.J. Feb. 28, 2018).  Indeed, the Third Circuit has made clear that "it is a misreading of [the Supreme Court's decision in] *Comcast* to interpret it as preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement."  *Neale*, 794 F.3d at 375 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-38 (2013)); *see also id.* at 374 ("*Comcast* is inapposite to the case before us.  *Comcast* held that an antitrust litigation class could not be certified because the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class-action treatment. . . . A close reading of the text . . . makes it clear that the predominance analysis was specific to the antitrust claim at issue."); *Papa*, 333 F.R.D. at 87 (same); *Novo*, 2020 WL 502176, at *9 (certifying class and noting that the court "need not assess the validity of Plaintiffs' damages model at this stage").

Notwithstanding this authority, Plaintiff proffers a class-wide methodology for calculating damages.  As a general matter, damages in securities fraud cases are

particularly susceptible to calculation through a common, class-wide methodology. *See, e.g.*, *Strougo*, 312 F.R.D. at 313 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").  This action is no different—the methodology by which damages will be measured is common to all Class members, is widely-accepted, and relates directly to Plaintiff's class-wide theory of liability such that common issues regarding damages will predominate.  Specifically, Plaintiff alleges that it and other Class members were damaged when they purchased Celgene common stock at prices that were artificially inflated by Defendants' material misrepresentations and omissions concerning Ozanimod and Otezla.

As Dr. Tabak explains, damages arising from the artificial inflation in Celgene's common stock price during the Class Period can be determined for any member of the Class by applying the widely accepted "out-of-pocket" measure of damages.  Tabak Report ¶¶ 60-65; *see Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 347 (E.D. Pa. 1979) ("[t]he out-of-pocket method is in fact the traditional method employed in securities fraud cases for calculating damages") (citing *Affiliated Ute*, 406 U.S. 128; *Thomas v. Duralite Co., Inc.*, 524 F.2d 577 (3d Cir. 1975)).

As set forth in the Tabak Report, damages can be calculated by first determining the inflation in Celgene's common stock based on the alleged corrective disclosures.  Tabak Report ¶¶ 62-64.  Damages for an individual Class member can

then be computed by calculating the amount of inflation in the price of a security at the time of purchase offset by the inflation in the price at the time of sale, with any other necessary adjustments (e.g., the 90-day lookback period adjustment set forth in the PSLRA). *Id.* ¶ 62. While the actual amount of damages sustained will differ depending on each Class member's transactions in Celgene common stock, the Third Circuit has emphasized that "individual damages calculations do not preclude class certification under Rule 23(b)(3)," a recognition that is "well nigh universal." *Neale*, 794 F.3d at 374-75 (quoting *Comcast*, 569 U.S. at 41 (2013) (Ginsburg, J. & Breyer, J., dissenting)). Setting aside any difference in the actual damages calculations for individual Class members, because the share price inflation, like the share price itself, is the same for all shares of Celgene traded on the NASDAQ, damages are calculated the same way for all Class members. Tabak Report ¶¶ 61-65.

Coupled with the presumption of reliance, questions of damages common to the Class will overwhelm any issues unique to individual members.

### B.     Class Treatment Is Superior to Other Methods of Adjudication

The superiority requirement of Rule 23(b)(3) requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing superiority, courts consider: (i) the interest of class members in individually controlling separate actions; (ii) the extent and nature of any litigation already underway; (iii) the desirability of

concentrating the litigation in the forum; and (iv) the manageability of a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).  Here, each factor favors certification.

Superiority "is easily satisfied in securities fraud cases where there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant."  *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *8 (D. Del. Jun. 6, 2013).  *First*, "[a] class action is certainly the superior method for adjudicating" securities fraud claims because, "as a practical matter, investors defrauded by securities law violations have no recourse other than class relief." *Papa*, 333 F.R.D. at 78.  *Second*, Class members' interests in individually controlling the prosecution of separate actions are minimal, and Plaintiff is not aware of any pending related individual actions.  *Third*, concentrating litigation in this forum is desirable.  The parties have been litigating this case since 2018, and the Court, having decided Celgene's motion to dismiss, is familiar with the facts and claims. *Fourth*, this case "clearly lies within the mainstream of securities fraud class actions" and, as such, poses no unique challenges of manageability.  *Zinberg v. Wash. Bancorp, Inc.*, 138 F.R.D. 397, 410 (D.N.J. 1990).

## III.   THE PROPOSED CLASS IS ASCERTAINABLE

Where "[t]here are objective records that can readily identify . . . class members," the ascertainability requirement is satisfied.  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 169 (3d Cir. 2015); *see also In re Cmty. Bank of N. Va. Mortg. Lending*

*Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (ascertainability satisfied where class members identifiable by reference to bank records).  The Class here includes all persons and entities who purchased or otherwise acquired Celgene common stock during the Class Period, a group that can be readily identified by reference to records of shareholder acquisitions.  Accordingly, the proposed class is ascertainable.

## CONCLUSION

Plaintiff respectfully requests that the Court grant this Motion, certify the proposed Class, appoint Plaintiff as Class Representative, and appoint Kessler Topaz as Class Counsel and Carella Byrne and Seeger Weiss as Co-Liaison Counsel for the Class.

Dated: May 1, 2020

Respectfully submitted,

/s/ *James E. Cecchi*

James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY
& AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

Christopher A. Seeger
**SEEGER WEISS, LLP**

Andrew L. Zivitz
Matthew L. Mustokoff
Joshua E. D'Ancona
Margaret E. Mazzeo
Nathan A. Hasiuk
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
azivitz@ktmc.com
mmustokoff@ktmc.com
jdancona@ktmc.com
mmazzeo@ktmc.com
nhasiuk@ktmc.com

55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100

*Co-Liaison Counsel for Lead Plaintiff*
*and Proposed Co-Liaison Counsel for*
*the Class*

*Lead Counsel for Lead Plaintiff*
*and Proposed Class Counsel*

Salvatore J. Graziano
Adam H. Wierzbowski
Brenna D. Nelinson
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448
salvatore@blbglaw.com
adam@blbglaw.com
brenna.nelinson@blbglaw.com

*Additional Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing to be electronically filed the with the CM/ECF system. Those attorneys who are registered with the Electronic Filing System will receive notice of this filing by ECF and email. I further certify that a courtesy copy of this filing will be served upon the Court.

Dated: May 1, 2020                **CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

                */s/ James E. Cecchi*
                James E. Cecchi