**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| *In re* CELGENE CORPORATION SECURITIES LITIGATION | Civil Action No. 18-4772 |
|  | **OPINION** |

**John Michael Vazquez, U.S.D.J.**

      This class action concerns allegations of securities fraud. Lead Plaintiff AMF Pensionsforsakring, AB ("AMF" or "Plaintiff") asserts that Defendant Celgene Corporation ("Celgene") and several of its key officers and/or employees engaged in fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* D.E. 57. The allegations pertain to public statements concerning two drugs in Celgene's new drug pipeline. Currently pending before the Court is Plaintiff's motion for class certification pursuant to Federal Rule of Civil Procedure 23. D.E. 90. The Court reviewed the parties' submissions in support and in opposition[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Plaintiff's motion is **GRANTED**.

### I.     INTRODUCTION

#### A. Factual Background

      As the parties are familiar with this matter, the Court does not provide a detailed factual recitation. Instead, the Court reviews relevant facts here and discusses certain additional facts in the analysis section below.

---

[1] Plaintiff's moving brief will be referred to as "Plf. Br.," D.E. 90-1; Defendants' opposition will be referred to as "Defs. Opp," D.E. 95; and Plaintiff's reply will be referred to as "Plf. Reply," D.E. 99.

Celgene is a biopharmaceutical company that primarily develops and commercializes drugs for the treatment of cancer and inflammatory diseases.[2]  SAC ¶ 64.  Celgene manufactures and sells the multiple myeloma drug Revlimid, which in 2010, accounted for approximately seventy percent of Celgene's total annual product sales.  *Id.* ¶ 99.  Revlimid's patent expires in 2022. *Id.* ¶ 101.  Plaintiff alleges that Defendants made material misrepresentations and omissions about two drugs, Otezla and Ozanimod, that Celgene touted as products to meet the anticipated revenue drop following the Revlimid patent expiration.[3]

Months before the Otezla launch in 2014, "Defendants primed the market that Otezla sales were poised to sky-rocket, representing that Otezla net product sales would reach $1.5 billion to $2 billion by 2017." *Id.* ¶¶ 205-06.  In a January 12, 2015 press release, Celgene set out its five-year strategic growth plan, including the 2017 projections.  *Id.* ¶ 207.  Throughout 2015 and 2016, Defendants represented that Celgene was on-track to meet the 2017 sales projection.  *Id.* ¶¶ 231-33.  As early as July 2016, however, Defendants purportedly received explicit warnings that the 2017 projection was unattainable.  *Id.* ¶ 234.  Publicly, however, Defendants continued to reaffirm the 2017 target.  *Id.* ¶ 242.

On October 26, 2017, Celgene "stunned the market by announcing that, in light of the dismal Otezla sales numbers, the Company had slashed the 2017 guidance by more than $250 million" and lowered the 2020 Inflammatory & Immunology ("I&I") guidance by over $1 million.

---

[2] The facts are derived from Plaintiff's Second Amended Complaint (the "SAC").  D.E. 57.

[3] In the SAC, Plaintiff asserted securities fraud claims based on misrepresentations and omissions as to a third drug, GED-0301.  Following Defendants' motion to dismiss, the Court determined that Plaintiff failed to state a claim with respect to GED-0301.  Dec. 19 Opinion at 24-28.  While Plaintiff was granted leave to file an amended complaint to address the identified deficiencies, including those pertaining to GED-0301, D.E. 76, Plaintiff did not do so.  As a result, Plaintiff's claims regarding GED-0301 are dismissed with prejudice.  D.E. 76.

*Id.* ¶ 264.  After this announcement, the price of Celgene common stock declined more than 16%; from $119.56 per share on October 25, 2017 to $99.99 per share on October 26, 2017.  *Id.* ¶ 269.

Ozanimod is another product in Celgene's I&I pipeline, and was initially developed by a different company, Receptos.  *Id.* ¶ 270.  On July 14, 2015, Celgene purchased Receptos for $7.2 billion.  In announcing the acquisition, Celgene "projected annual Ozanimod sales of up to $6 billion."  *Id.* ¶ 271.  Ozanimod was not approved by the U.S. Food and Drug Administration ("FDA") when Celgene acquired Receptos, but Celgene anticipated filing a New Drug Application ("NDA") for Ozanimod with the FDA in 2017.  *Id.* ¶¶ 275-79.

Through a Phase I trial that Celgene started in October 2016, Celgene identified a metabolite named CC112273 (the "Metabolite"), "which triggered the need for the additional testing described in the FDA guidance" before FDA approval.  *Id.* ¶¶ 51, 297-98.  Despite the need for additional testing after discovery of the Metabolite, Defendants continued to represent that Celgene was on track to submit the NDA before the end of 2017 and failed to disclose information about the Metabolite.  *See, e.g.*, *id.* ¶¶ 307, 308, 315.  Even after the FDA expressly informed Celgene that it needed to include the Metabolite testing results with its NDA submission, Celgene continued to move forward with its plan to submit the NDA in December 2017 without the Metabolite study results.  *Id.* ¶ 318.

Celgene submitted the Ozanimod NDA in December 2017 as planned.  *Id.* ¶ 319.  After submitting the NDA, Celgene issued a press release on January 8, 2018 stating that it expected an FDA decision on the NDA in 2018.  *Id.* ¶ 322.  On February 27, 2018, Celgene disclosed that it received a refuse to file ("RTF") letter from the FDA in response to the Ozanimod NDA submission.  An RFT letter indicates that the FDA "identifie[d] clear and obvious deficiencies" in the NDA.  *Id.* ¶¶ 323-24.  As a result of the RFT announcement, Celgene's common stock fell

from $95.78 per share on February 27, 2018 to $87.12 per share on February 28, 2018.  *Id.* ¶ 330.

Then on April 29, 2017, Plaintiff alleges that the market learned through a Morgan Stanley report

that additional testing on the Metabolite was required, which could delay the refiling of the

Ozanimod NDA by up to three years.  *Id.* ¶ 332.  Celgene's common stock fell again, from $95.78

per share on April 27, 2018 to $87.10 per share on April 30, 2018.  *Id.*

### B.  Procedural History

Plaintiff the City of Warren General Employees' Retirement System filed the initial

putative class action complaint in this matter on March 29, 2018.  D.E. 1.  On September 26, 2018,

this Court consolidated two related cases; appointed AMF as the Lead Plaintiff; and appointed

class counsel.  D.E. 36.  AMF then filed the SAC on February 27, 2019, alleging (i) violations of

Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (ii) violations of

Section 20(a) of the Exchange Act against Defendants Alles, Kellogg, Smith, Curran, Hugin, and

Fouse.  D.E. 57.

On February 8, 2019, Defendants filed their motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

D.E. 52.  The Court then entered an Opinion and Order granting in part and denying in part

Defendants' motion to dismiss (the "Dec. 19 Opinion").  D.E. 75, 76.  The Court dismissed

Plaintiff's Section 20(a) claim and narrowed the Section 10(b) and Rule 10b-5 claim, as it

determined that many of the alleged misrepresentations and omissions were not actionable.  The

Court discusses specifically which alleged misrepresentations and omissions remain after the

December 19 Opinion in the analysis section below, as the parties appear to disagree over the

scope of the December 19 Opinion.

Plaintiff subsequently filed the instant motion to certify a class.  D.E. 90.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Id.* at 590 (citing Fed. R. Civ. P. 23(a)-(b)).   Plaintiff first bears the burden of showing that the proposed class satisfies the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  These four prongs are often referred to as numerosity, commonality, typicality, and adequacy.  *See, e.g., Erie Ins. Exch. v. Erie Indem. Co.*, 722 F.3d 154, 165 (3d Cir. 2013).

Plaintiff must also show that proposed class satisfies Rule 23(b)(1), (b)(2), or (b)(3). *Marcus*, 687 F.3d at 590.  Here, Plaintiff argues that the putative class meets the requirements of Rule 23(b)(3).  Under Rule 23(b)(3), a plaintiff must show the following:

> [Q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Pursuant to Rule 23(c)(1)(A), a court "must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The decision to certify a class or classes is left to the discretion of the court. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009). "[T]he requirements set out in Rule 23 are not mere pleading rules." *Marcus*, 687 F.3d at 591 (alteration in original) (quoting *Hydrogen Peroxide*, 552 F.3d at 316). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Id.* "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." *Hydrogen Peroxide*, 552 F.3d at 318.

The Third Circuit emphasizes that "'[a]ctual, not presumed[,] conformance' with Rule 23 requirements is essential." *Marcus*, 687 F.3d at 591 (alterations in original) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). "To determine whether there is actual conformance with Rule 23, a district court must conduct a 'rigorous analysis' of the evidence and arguments put forth." *Id.* (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This "rigorous analysis" requires a district court to "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action." *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 307, 316). Therefore, a district court "may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" *Hydrogen Peroxide*, 552 F.3d at 320 (quoting *Newton*, 259 F.3d at 167).

### III.     ANALYSIS

#### A.  Rule 23(a) Requirements

##### 1.  Numerosity

"No single magic number exists" to meet the numerosity requirement.  *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 139 (D.N.J. 2009) (quotation omitted).  Yet, "the Third Circuit has previously held that the numerosity requirement will generally be satisfied 'if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40.'"  *Id.* (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

Plaintiff contends that during the Class Period, Celgene's securities traded on the NASDAQ and there were approximately 775 million shares of outstanding common stock.  Plf. Br. at 12.  Moreover, 1,800 institutional investors purchased or otherwise acquired Celgene common stock during this time.  *Id.*  Defendants do not address numerosity.  The Court finds that Plaintiff satisfies the numerosity requirement.

##### 2.  Commonality

"Rule 23(a)(2) requires Plaintiffs to demonstrate that 'there are questions of law or fact common to the class.'"  *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018) (quoting Fed. R. Civ. P. 23(a)(2)).  However, Rule 23(a)(2)'s "language is easy to misread, since any competently crafted class complaint literally raises common questions."  *Id.* at 487 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation omitted)).  "A complaint's mere recital of questions that happen to be shared by class members" is insufficient; instead, "'[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury.'"  *Id.* (alterations in original) (quoting *Dukes*, 564 U.S. at 349-50) (internal quotation omitted).  "What matters . . . is not the raising of common 'questions' . . . but, rather the

capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).  In other words, Plaintiff's claims "must depend upon a common contention" whereby "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  "Courts in this Circuit have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74-75 (D.N.J. 2019) (quoting *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018)) (internal punctuation omitted).

Plaintiff argues that there are numerous common questions here, including whether Defendants made material misrepresentations or omissions, and if Defendants acted with scienter when making the alleged statements.  Further, Plaintiff maintains that resolution of these common questions will drive the overall course of the litigation.  Plf. Br. at 13-14.  Defendants also do not contest the commonality requirement.   The Court is satisfied that Plaintiff satisfies the commonality requirement.

### 3.  Typicality

"[T]ypicality demands that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Newton*, 259 F.3d at 185 (quoting Fed. R. Civ. P. 23(a)(3)). In other words, a lead plaintiff's claims must be "comparably central" to the claims of the absent parties.  *Id.* at 183.  This ensures that "the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'"  *Id.* at 182-83 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)).

The typicality requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Id.* at 183. At the same time, all plaintiffs are not required to share identical factual circumstances – the requirement only mandates that a named plaintiff's individual circumstances cannot be "markedly different" from the other class members. *Id.* "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id.* at 183-84. For example, "a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice." *Id.* at 184 (citing *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994)). The typicality requirement "does not mandate that all putative class members share identical claims, because even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.* (internal quotations and citations omitted).

Plaintiff maintains that typicality is satisfied here because it, and the other class members, assert the same claims under federal securities laws due to the same allegedly wrongful conduct by Defendants - that Defendants made material misrepresentations and omissions regarding Ozanimod and Otezla. In addition, Plaintiff contends the entire class was damaged by this wrongdoing because it caused class members to purchase Celgene common stock at artificially inflated prices. Plf. Br. at 15. Defendants do not address typicality. The Court determines that the typicality requirement is satisfied.

### 4.  Adequacy

In reviewing the adequacy requirement, a court must decide whether the class representative "has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class."  *Sapir v. Averback*, No. 14-07331, 2015 WL 858283, at *3 (D.N.J. Feb. 26, 2015) (citing *Falcon*, 457 U.S. at 157 n. 13).   "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class."  *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).   Adequacy functions as a "catch-all requirement" that "tend[s] to merge with the commonality and typicality criteria of Rule 23(a)."  *Newton*, 259 F.3d at 185 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  "Whether a party adequately represents a class depends on all the circumstances of the particular case."  *Wetzel*, 508 F.2d at 247.

Defendants do not dispute that class counsel is adequate, but rather, contend that Plaintiff is an inadequate Lead Plaintiff do to certain unique defenses.  Turning first to class counsel, Kessler Topaz is skilled and has experience with securities fraud litigation.  Class counsel is adequate.

As for Defendants' contention that Plaintiff is an inadequate lead plaintiff, Defendants first argue that Plaintiff should be disqualified as lead plaintiff because of its spoliation of critical evidence.  Defs. Opp. at 10-17.  Federal Rule of Civil Procedure 37(e) governs the preservation of electronically stored information ("ESI") and provides that a court may issue sanctions if a party fails to preserve such evidence.  Fed. R. Civ. P. 37(e).  Pursuant to Rule 37(e), a court must first determine whether spoliation occurred, and then should address an appropriate sanction.  *Goldrich v. City of Jersey City*, No. 15-885, 2018 WL 4492931, at *7 (D.N.J. July 25, 2018).  To establish

spoliation, the party seeking sanctions must demonstrate that "the evidence was in the [offending] party's control, the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve evidence was reasonably foreseeable to the party." *Eisenband v. Pine Belt Auto., Inc.*, No. 17-8549, 2020 WL 1486045, at *7 (D.N.J. Mar. 27, 2020) (quoting *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 74 n. 5 (3d Cir. 2012)). To impose sanctions due to a party's spoliation, "the Court must find either prejudice to [the moving party] or that [the offending party] acted with the intent to deprive [the moving party] of the ESI's use in the litigation." *Goldrich*, 2018 WL 4492931, at *7.

Here, Defendants' spoliation argument is based on the fact that when Plaintiff's initial corporate designee left his job at AMF after litigation had commenced, Plaintiff deleted the designee's email box. Defs. Opp. at 11. According to Plaintiff, after Plaintiff received a litigation hold notice in approximately May or June 2016, Plaintiff took internal steps to maintain relevant documents. Decl. of James E. Cecchi ("Cecchi Decl."), Ex. 1 at T153:21-155:2 (June 10, 2020). Despite these internal steps, Plaintiff learned in 2020 that the designee's email account had been deleted and Plaintiff could not recreate the contents of the email box after learning about the deletion. *Id.* at T155:3-11.

Defendants fail to demonstrate that Plaintiff acted with the intent to deprive Defendants of ESI. Accordingly, assuming spoliation, Defendants must establish that they were prejudiced. *Goldrich*, 2018 WL 4492931, at *7. "Courts have found prejudice exists where documents that are relevant to a claim are unreviewable and the moving party has come forward with a plausible, good faith suggestion as to what the evidence might have been." *Id.* at *10; *see also Percella v. City of Bayonne*, No. 14-3695, 2020 WL 6559203, at *11 (D.N.J. Nov. 9, 2020) ("When a party moving for spoliation cannot offer 'plausible, concrete suggestions as to what the lost evidence

might have been,' there should be no finding of prejudice." (quoting *GN Netcom, Inc. v. Platronics, Inc.*, 930 F.3d 76, 83-85 (3d Cir. 2019))).

Defendants contend that they have been prejudiced because the destroyed emails "could have supplied a strong defense to certification" and that they have been deprived of the ability to fully disprove AMF's typicality and adequacy in connection with the motion for class certification. Defs. Opp. at 15.  But outside of speculation, Defendants fail to plausibly identify any relevant information that was likely destroyed.  Defendants, therefore, fail to meet their burden of establishing prejudice.  Without prejudice, spoliation sanctions are not appropriate here. Moreover, without prejudice, the Court will not conclude that Plaintiff is an inadequate class representative because it inadvertently deleted an email account of a departing employee.

Defendants also argue that Plaintiff lacks standing to assert its claims as they pertain to Ozanimod because its last purchase of Celgene common stock occurred before any Defendant made an alleged wrongful statement about the drug.  As a result, Defendants continue, Plaintiff is not an adequate class representative. Defs. Opp. at 22.  A plaintiff alleging securities fraud "cannot rely on statements made subsequent to [its] purchase . . . because [a plaintiff[]] could not have relied on the statements in making [its] purchase in the first place."  *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 565 (D.N.J. June 2, 1992).  Thus, a lead plaintiff does not have standing to assert Section 10(b) and Rule 10b-5 claims based on statements made after its purchase.  *Winer Family Trust v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007).

Defendants' argument is based on an incorrect reading of the December 19 Opinion.  In its discussion about whether Plaintiff sufficiently alleged actionable statements about Ozanimod, the Court specifically discussed statements that occurred on October 26 and 28, 2017.  Dec. 19 Opinion at 38-39.  Defendants interpret the Court's discussion as limiting Plaintiff's Ozanimod

claims solely to these statements. Defs. Opp. at 22. Consequently, because Plaintiff's final purchase of Celgene common stock occurred on October 12, 2017, Am. Compl., Ex. A, D.E. 40-1, Defendants maintain that Plaintiff lacks standing because the only actionable statements occurred after Plaintiff's purchases, Defs. Opp. at 22. But the Court's use of the signal "*See, e.g.,*" in its discussion of actionable statements demonstrates that the October statements were merely examples; they are not the *only* actionable statements.

In the December 19 Opinion, the Court determined[4] that "at a minimum," Defendants Tran and Martin knew, by April 2017, about the Metabolite and that additional testing was necessary. The Court also determined that because of Tran and Martin's knowledge, Plaintiff established scienter for Smith. Dec. 19 Opinion at 44. Thus, by April 2017, statements attributable to Tran, Martin, and Smith were actionable.[5] *Id.* at 38-39, 44. And in the SAC, Plaintiff sufficiently alleges that Smith made material misrepresentations, or "half-truths" between April 2017 and October 12, 2017. *See* FAC ¶¶ 432, 443-44. During a call discussing Celgene's first quarter financial results, Smith presented a slide that "touted 'Advancing Ozanimod Development Programs'" and stated that Celgene would submit its NDA" in 2017. *Id.* ¶ 432. As discussed, because Smith was discussing the Ozanimod NDA, his failure to discuss the Metabolite and the need for additional testing was misleading. Dec. 19 Opinion at 38-39. Smith made similar non-forward-looking statements during a conference call on July 27, 2017. SAC ¶¶ 443-444. For the same reasons as

---

[4] To be clear, the Court did not, and is not, making any dispositive factual findings. Instead, in the Dec. 19 Opinion, the Court assumed the truth of all well-pleaded allegations and gave Plaintiff the benefit of all reasonable inferences to be drawn from those allegations. The Court does the same here.

[5] It could reasonably be inferred that Smith was aware approximately around the same time as Martin, because Martin reported to Smith. Smith also made an actionable statement in July 2017. The July 2017 statement is sufficient to convey Plaintiff with standing.

discussed for Smith's April 2017 statement, this statement is also actionable.[6]   Accordingly, Plaintiff has standing to assert its Ozanimod claims.[7]   Plaintiff satisfies the adequacy requirement.

For the foregoing reasons, the Court concludes that the Rule 23(a) requirements are met in this matter.  The Court now turns to its Rule 23(b) analysis.

### B.  Rule 23(b)(3) Requirements

As discussed, Plaintiff seeks to certify its class pursuant to Rule 23(b)(3).   The requirements for Rule 23(b)(3) class certification are that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy."  *Dukes*, 564 U.S. at 362 (emphases added) (citing Fed. R. Civ. P. 23(b)(3)).  These elements are commonly referred to as the "predominance" and "superiority" requirements.  *Id.* The Third Circuit has also recognized that "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable."   *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015).

---

[6] Defendants argue that AMF does not sufficiently allege that Smith's July comment was made in connection to the NDA filing.  Defs. Opp. at 20 n. 10.  But Plaintiff alleges that after Curran presented a slide stating that Celgene anticipated filing the NDA by year end, SAC ¶ 442, Smith stated "just to add on to the comments, we feel very, very good about the data that's emerging for ozanimod and looking forward to getting it out," *id.* ¶ 443.  As pled, it appears that Smith's comment was made in reference to the NDA; at a minimum, such an inference is reasonable. Defendants are improperly viewing Smith's statements in isolation rather than reading the pleading as a whole.

[7] Plaintiff also contends that it has standing based on official company statements in SEC filings and press releases issued beginning in April 2017.  Plf. Reply at 15-16.  It is not clear whether scienter can be imputed to a corporation without first establishing scienter for a specific individual. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n. 6 (3d Cir. 2018) (explaining that the circuit has "neither accepted nor rejected" the doctrine of corporate scienter, which "allows a plaintiff to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant" (internal citation omitted)). Because Plaintiff has standing via Smith's statements, the Court does not address this argument.

### 1. Predominance

The predominance requirement is "a 'far more demanding' standard than the commonality requirement of Rule 23(a)." *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) (quoting *Amchem Prods.*, 521 U.S. at 624). It "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "Predominance turns on the 'nature of the evidence' and whether 'proof of the essential elements of the cause of action requires individual treatment.'" *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016) (quoting *Hydrogen Peroxide*, 552 F.3d at 311).

"At the class certification stage, the predominance requirement is met only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (quoting *Gonzalez*, 885 F.3d at 195 (internal quotation omitted)). To assess this requirement, district courts "must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove' those elements." *Id.* at 128 (quoting *Marcus*, 687 F.3d at 600).

In this instance, Plaintiff seeks class certification on its Section 10(b) and Rule 10b-5 claim. To establish its securities claims, Plaintiff must establish "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic

loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Plaintiff asserts that scienter, materiality, falsity of the alleged actionable statements and loss causation are issues common to the class. Plf. Br. at 20. Defendants do not appear to dispute this point. "[A] failure of proof" on any of these issues would end the case for all class members. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459-60 (2013). Therefore, Plaintiff establishes that common issues predominate for each of these elements of Plaintiff's Section 10(b) and Rule 10b-5 claim.

### a. Damages

Plaintiff also argues that there is a class-wide methodology for calculating damages. Plf. Br. at 35-37. A plaintiff is not required to establish precise damages calculations at the class certification stage. *Roofer's Pension Fund*, 333 F.R.D. at 88. Here, Plaintiff explains that damages from the artificial inflation of Celgene common stock "can be determined for any member of the Class by applying the widely accepted 'out-of-pocket' measure of damages." Plf. Br. at 36. While Plaintiff concedes that this will result in differing amounts of damages based each class member's specific transactions in Celgene common stock, "[c]lass certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages." *In re Novo Nordisk Sec. Litig.*, No. 17-209, 2020 WL 502176, at *9 (D.N.J. Jan. 31, 2020). Moreover, "in securities cases . . . where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be an 'abuse of discretion.'" *Id.* (quoting *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015)). Defendants also do not appear to dispute Plaintiff's proposed method of calculating damages. As a result, the Court concludes that questions of damages common to the class predominate over individual issues.

### b.  Reliance

To establish reliance, Plaintiff invokes the rebuttable *Basic* presumption.  *See Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 268 (2014).  Defendants maintain that Plaintiff cannot establish reliance on a class-wide basis because they rebut the *Basic* presumption.  Defs. Opp. at 23-38.

The presumption is based on the economic theory "that the market price of shares traded on well-developed markets reflects all publicly available information," such that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price."  *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988); *see also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 n. 5 (3d Cir. 2005) (explaining that in an efficient market, "'information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices.'" (quoting *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1415 n. 1, 1419 n. 8 (3d Cir. 1997)).  To establish reliance through the *Basic* presumption, a plaintiff must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton II*, 573 U.S. at 268.  If a plaintiff satisfies this *prima facie* showing, a defendant can rebut the *Basic* presumption by demonstrating "that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'"  *Id.* at 263-64, 269.  In addition, a defendant "need only produce enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'"  *Bing Lin*, 324 F.R.D. at 344 (citing *Lupyan v. Corinthian Colls., Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)).  If a defendant rebuts the presumption, the matter cannot

proceed as a class action because individual issues of reliance will predominate over common questions of law and fact. *Halliburton II*, 573 U.S. at 281-82.

AMF presents a *prima facie* case establishing that the *Basic* presumption applies: (1) Defendants' alleged misrepresentations were public statements made to investors and the public at large; (2) the alleged misrepresentations were material; (3) Celgene stock traded in an efficient market[8]; and (4) Plaintiff and all other members of the putative class purchased Celgene common stock during the period in which Defendants made the purported misrepresentations and when the truth was revealed. To rebut the presumption, Defendants' rely on their expert report, which, in part, critiques a study performed by Plaintiff's expert. According to Dr. Gompers, Defendants' expert, the study demonstrates that except for two alleged misrepresentations, for which Plaintiff lacks standing, there was no front-end price impact associated with the actionable misrepresentations, or in other words, Celgene's stock did not increase after the alleged wrongful statements. Defs. Opp. at 26. Defendants continue that this evidence alone is sufficient to rebut the *Basic* presumption. *Id.*

---

[8] To assess market efficiency, courts apply the *Cammer* factors, which are as follows: "(1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstratable cause and effect relationship between the release of information about the company and movements in the stock price." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.* No. 12-5275, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). A court should also consider "(1) the magnitude of the company's market capitalization; (2) the size of the bid-ask spread for the company's stock . . . ; and (3) the company's float." *Id.* (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005)). Moreover, Celgene common stock traded on the NASDAQ during the Class Period, *see* Cecchi Decl., Ex. 1 at ¶¶ 27, 48, which also "weighs in favor of a finding of market efficiency." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011). Defendants do not challenge Plaintiff's evidence or conclusion about market efficiency.

Plaintiff counters that "[m]istatements need not cause a stock price increase to establish reliance—they can instead *maintain* existing inflation in the stock price." Plf. Reply at 19. But Defendants respond that a maintenance theory is not sufficient in light of their evidence of no price impact. Defs. Opp. at 27. Under the price maintenance theory "statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price." *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017). And "price impact is shown if, when the truth is revealed, the artificial inflation in the stock price (maintained as a result of a repeated misrepresentation) dissipated and the price of the stock fell." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-1580, 2019 WL 5287980, at *21 (S.D.N.Y. Oct. 18, 2019).

The Third Circuit has not addressed if a plaintiff that invokes the *Basic* presumption can rely on a price maintenance theory. Therefore, Defendants argue that this Court should follow the Eighth Circuit's approach in *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775 (8th Cir. 2016). Defs. Opp. at 27. In *Best Buy*, the plaintiffs alleged that the defendants made actionable misrepresentations in a press release and during a conference call that occurred a few hours after the press release was issued. The district court dismissed the plaintiffs' claims as they pertained to the press release. Thus, the only actionable misrepresentations occurred during the conference call. *Best Buy*, 818 F.3d at 777-78. At the class certification stage, the defendants relied on the plaintiffs' own expert to rebut the *Basic* presumption because the plaintiffs' expert "opined that the 'economic substance' of the non-fraudulent press release statements and the alleged misrepresentations in the immediately following conference call was 'virtually the same.'" *Id.* at 782. Further, the expert's study showed that the press release had an immediate impact on the market price, while the alleged misrepresentations during the conference call had no additional

price impact.  As a result, the plaintiffs' expert "opined that investors gave the EPS guidance in the press release 'great weight.'  Combined with the absence of further price impact following the conference call, this was direct evidence that the investors did not rely on the executives' confirming statements two hours later."  *Id.*  The defendants' expert reached the same conclusion. *Id.*

On appeal, the Eighth Circuit determined that the plaintiffs met their *prima facie* burden to establish that the *Basic* presumption applied and that the defendants presented evidence that rebutted the presumption.  *Id.* at 782.  The *Best Buy* court indicated that the plaintiffs' expert opinion demonstrating "no 'front-end' price impact rebutted the *Basic* presumption."  *Id.*  The court in *Best Buy* continued that the plaintiffs' theory of price maintenance, based on the fact that the stock price did not change after the conference call, "provided no evidence that refuted defendants' overwhelming evidence of no price impact."  *Id.* at 783.  Thus, the Eighth Circuit's decision was based on the specific evidence presented in that matter – namely that the plaintiffs' own expert attributed the entire price change to the press release.  Because the plaintiffs' expert opined that the alleged misrepresentations during the call did not impact the stock price, the *Best Buy* court refused to credit the plaintiffs' price maintenance theory argument.

But the Eighth Circuit did not, as Defendants argue, outright reject the price maintenance theory.  *See Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-871, 2020 WL 5757695, at *12 (D. Minn. Sept. 28, 2020) ("While the Eighth Circuit has not explicitly endorsed the price maintenance theory, it has not rejected the theory.").  Yet, even if this Court did read *Best Buy* as adopting a wholesale repudiation of the price maintenance theory, the position appears to be the minority view as the Second, Seventh, and Eleventh Circuits have all explicitly adopted the theory. *See Waggoner*, 875 F.3d at 104 (recognizing that the plaintiffs were relying on a price maintenance

theory, "which we have previously accepted" and that "the district court was well within its discretion in concluding that the lack of price movement on the dates of the alleged misrepresentations does not rebut the *Basic* presumption"); *Glickenhous & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015) (recognizing that a plaintiff can rely on a price maintenance theory); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) ("Defendants whose fraud *prevents* preexisting inflation in a stock price from dissipating are just as liable as defendants whose fraud introduces inflation into the stock market in the first instance.").[9]

District courts within the Third Circuit have also recognized that a plaintiff can proceed on a price maintenance theory. *See, e.g.*, *Prudential Fin., Inc.*, 2015 WL 5097883, at *12 n. 8 ("[I]t also does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact. It is possible that those statements assisted in the maintaining an inflated price[.]"); *see also W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016) (same). Accordingly, the weight of authority and the persuasiveness of the reasoning demonstrate that Plaintiff can also proceed through a price maintenance theory.

The Court, therefore, turns to Defendants' evidence to determine whether they rebut the *Basic* presumption. To do so, Defendants must produce evidence "demonstrating that the purported misrepresentation or material omission had no price impact." *Bing Li*, 324 F.R.D. at 343. Defendants fail to do so.

---

[9] The Second and Seventh Circuits recently reaffirmed the validity of the price maintenance theory. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020) (explaining that the Circuit previously endorsed the "inflation maintenance" theory "and affirm[s] its viability again now"); *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 264 (2d Cir. 2020) (explaining that "inflation-maintaining statements" can be sufficient to demonstrate a price impact).

In the December 19 Opinion, the Court determined that Plaintiff sufficiently pled facts establishing that the price of Celgene common stock fell after Celgene made its corrective disclosures for Otezla and Ozanimod.  Dec. 19 Opinion at 47.  Now, Defendants simply maintain that Plaintiff's expert's event study "demonstrates that there was no front-end price impact . . . associated with any of the alleged misstatement that AMF contends still remain in the case, except for two."  Defs. Opp. at 26 (citing Declaration of Nidhi Yadava ("Yadava Decl."), Ex. 1 at ¶¶ 24-25).  Because Plaintiff is relying on the price maintenance theory, this evidence does not rebut the *Basic* presumption.  Defendants provide no further evidence to suggest that the purported misrepresentations and omissions did not actually affect the market price.  Accordingly, Plaintiff establishes reliance under the *Basic* presumption.

Defendants also argue that even under the price maintenance theory, reliance cannot be presumed after February 27, 2018, the date when Celgene announced that the FDA rejected the Ozanimod NDA.  Defs. Opp. at 28.  Plaintiff counters that the Class Period should continue until April 29, 2018, when Morgan Stanley reported that the Ozanimod NDA would likely be delayed one to three years because of the need for additional testing.  Plf. Reply at 21-26.  "[C]ourts are required to cut off the Class Period on the date of a statement or event that cures the market. Where, however, there is an issue of fact as to whether a particular disclosure cured the market . . . a broader time period should be certified."  *In re Chi. Bridge & Iron Co.*, 2019 WL 5287980, at *40.

Here, Celgene's alleged misrepresentations about Ozanimod addressed the timing of its NDA, specifically that Celgene was on-track to submit the application by the end of 2017.  Plaintiff alleges that these statements were misleading because after Celgene discovered the Metabolite, it knew that the NDA would be rejected.  Moreover, in the December 19 Opinion, the Court

determined that Defendants' failure to disclose the Metabolite discovery and the need for additional testing are actionable half-truths.  Dec. 19 Opinion at 36.  Thus, Celgene's February 27, 2018 announcement did not fully correct the market because on February 27, Celgene only announced that it had received an RFT from the FDA.  SAC ¶ 489.  Critically, Celgene did not disclose the Metabolite or that additional testing was necessary.  Approximately two months later, Plaintiff contends that the market finally learned about the Metabolite, and on April 29, 2018, that it would take one to three years to complete the necessary additional testing.  *Id.* ¶¶ 495-503.  Accordingly, it appears as if the alleged misstatements and omissions were not fully cured until April 29.

Defendants, however, contend that before April 29, analysts had already predicted multiyear delays for Ozanimod, and that the market had already reacted to this news.  Defs. Opp. at 31.  Defendants' expert, Dr. Gompers, explains that the April 29 report was based on "previously published studies and FDA guidance," and Plaintiff's expert "acknowledged in deposition that he was also able to obtain the information that Morgan Stanley utilized to form its [April 29] opinion."  Yadava Decl. Ex. 1 at ¶ 44.  But Defendants merely attack Plaintiff's expert report.  This is insufficient to rebut the *Basic* presumption as a defendant "bears the burden to prove a lack of price impact through *direct evidence*."  *Prudential*, 2015 WL 5097883, at *12 (emphasis added); *see also DFC Glob. Corp.*, 2016 WL 4138613, at *14 (explaining that the defendants failed to rebut the *Basic* presumption because "[t]hey did not include their own event study and instead have simply tried to attack Plaintiff's expert").  Defendants do not provide their own evidence demonstrating that the market had already reacted to news of the Metabolite or the delay caused by additional testing, or otherwise explain why the price drop occurred on April 30.  *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n. 18 (2d Cir. 2020) ("Thus,

for a defendant to erase the inference that the corrective disclosure had price impact—*i.e.*, that it played some role in the price decline—it must demonstrate under the preponderance-of-the-evidence standard, using event studies or other means, that the other events explain the entire price drop.").

In sum, Defendants fail to rebut the *Basic* presumption of reliance for the entire proposed Class Period.[10]   The Court, therefore, concludes that Plaintiff satisfies the predominance requirement because common issues of law and fact predominate over individualized inquiries.

### 2. Superiority

To assess superiority, courts consider (1) class members' interests in individually controlling separate actions; (2) the extent and nature of litigation of any related litigation that is already underway; (3) the desirability of concentrating litigation of the claims in the particular forum; and (4) the manageability of a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).  In considering these factors, Plaintiff argues that class actions are a superior method to adjudicate securities fraud claims because there are many individual plaintiffs who have suffered from a relatively small amount of damage.  Plaintiff also contends that class members' interests in individually controlling separate matters is minimal and Plaintiff is not aware of any other pending related matters.  Finally, Plaintiff argues that concentrating the claims is this forum is desirable because this Court is already familiar with the matter.  Plf. Br. at 38.  The Court agrees and finds that Plaintiff satisfies the superiority requirement.

---

[10] Plaintiff contends that if the Court rejects its *Basic* presumption argument, reliance can be established through the *Affiliated Ute* presumption.  Plf. Br. at 34-35.  Because the Court concludes that the *Basic* presumption applies and that Defendants fail to rebut the presumption, the Court does not address the *Affiliated Ute* presumption.

### 3.   Ascertainability

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. "However, a plaintiff need not 'be able to identify all class members at class certification – instead, a plaintiff need only show that class members can be identified.'" *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020) (quoting *Byrd*, 784 F.3d at 163 (internal quotation omitted)). The class here consists of all persons and entities who purchased or otherwise acquired Celgene common stock during the Class Period. This group can easily be identified by referencing shareholder acquisition records. Consequently, the proposed class is ascertainable.

## IV.   CLASS DEFINITION

Rule 23(c)(1)(B) requires that the class-certification order or incorporated opinion indicate "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Byrd*, 784 F.3d at 163 (citing *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006)). Therefore, the Court certifies a Rule 23(b)(3) class consisting of

> All persons and entities who purchased the common stock of Celgene Corp. between April 27, 2017 through and April 27, 2018, and were damaged thereby. Excluded from the class are: (i) Celgene; (ii) any directors and officers of Celgene during the Class Period and members of their immediate families; (iii) the subsidiaries, parents and affiliates of Celgene; (iv) any firm, trust,

corporation or other entity in which Celgene has or had a controlling interest; and (v) the legal representatives, heirs, successors and assigns of any such excluded party.

## V.      CONCLUSION

For the reasons stated above, Plaintiff's motion for class certification (D.E. 90) is **GRANTED**.  An appropriate Order accompanies this Opinion.

Dated: November 25, 2020

John Michael Vazquez, U.S.D.J.