# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re Celgene Corporation Securities Litigation. | ) ) ) ) ) ) ) ) ) ) | Case No. 18-cv-04772 (JMV) (JBC)<br><br>CLASS ACTION<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY THE CLASS PERIOD IN LIGHT OF THE SUPREME COURT'S RECENT DECISION IN *GOLDMAN SACHS GROUP, INC. v. ARKANSAS TEACHER RETIREMENT SYSTEM*

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ....................................................................................... i

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    A.   Plaintiff's Claims ...................................................................... 2

    B.   The Court's Class Certification Ruling ................................... 3

    C.   The Supreme Court's *Goldman Sachs* Decision .................... 6

ARGUMENT ...................................................................................................... 8

    A.   *Goldman Sachs* Requires Full Consideration of Defendants'
        Evidence Demonstrating that the April 29 Morgan Stanley
        Report Was Not a Corrective Disclosure ............................... 8

    B.   Because the April 29 Morgan Stanley Report Was Not a
        Corrective Disclosure, There Is No Basis to Infer Price
        Impact from the Stock Drop Following That Report ................ 10

CONCLUSION ................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
__ F.4th __, 2021 WL 3776297 (2d Cir. Aug. 26, 2021) ...........................................7, 8

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) ...........................................................................................1

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..............................................................................................*passim*

*Brady v. Deloitte & Touche LLP*,
No. C 08-177, 2012 WL 1059694 (N.D. Cal. Mar. 27, 2012) .......................................1

*City of Sterling Heights Gen. Emps'. Ret. Sys. v. Prudential Fin., Inc.*,
No. 12-cv-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015)........................................5

*Doe v. Karadzic*,
192 F.R.D. 133 (S.D.N.Y. 2000) ..................................................................................1

*Endo v. Albertine*,
No. 88 C 1815, 1995 WL 170030 (N.D. Ill. Apr. 7, 1995)............................................1

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021)..........................................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......................................................................................................3

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020)......................................................................................7, 9

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17-cv-1580, 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ..........................11, 17

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17-cv-1580, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .................................11

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) ........................................................................................11

*In re Nektar Therapeutics*,
No. 18-cv-6607, 2020 WL 3962004 (N.D. Cal. July 13, 2020)...................................12

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ...........................................................................11, 12, 17

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Johnson v. GEICO Cas. Co.,*
    672 F. App'x 150 (3d Cir. 2016) ..................................................................... 1

*Lau v. Opera Ltd.,*
    __ F. Supp. 3d __, 2021 WL 964642 (S.D.N.Y. Mar. 13, 2021) ................................ 12

*Meyer v. Greene,*
    710 F.3d 1189 (11th Cir. 2013) .......................................................... 11, 12, 17

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.,*
    499 F. Supp. 3d 49 (D. Del. 2020) ................................................................. 12

*Stein v. Tangoe, Inc.,*
    No. 13-cv-286, 2014 WL 12767210 (D. Conn. Sept. 30, 2014) ......................... 11, 17

*United States v. Schiff,*
    602 F.3d 152 (3d Cir. 2010) ....................................................................... 10

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.,*
    No. 13-cv-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ...................................... 5

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.,*
    325 F.R.D. 280 (D. Minn. 2018) .............................................................. 11, 17

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ...............................................................................*passim*

# INTRODUCTION

In November 2020, after having dismissed the overwhelming majority of claims brought by Lead Plaintiff AMF Pensionsförsäkring AB ("AMF") in this federal securities-fraud action against Defendant Celgene Corporation ("Celgene") and certain of Celgene's current and former officers and employees, the Court granted AMF's motion for class certification and certified a class consisting of purchasers of Celgene stock between April 27, 2017 and April 27, 2018 for what little remains of this case.[1]  Under Federal Rule of Civil Procedure 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment."  *See Johnson v. GEICO Cas. Co.*, 672 F. App'x 150, 157 (3d Cir. 2016) ("'District courts are required to reassess their class rulings as the case develops' to ensure that the class satisfies Rule 23." (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998))); *see also, e.g.*, *Endo v. Albertine*, No. 88 C 1815, 1995 WL 170030 (N.D. Ill. Apr. 7, 1995) (shortening class period for previously certified class).  One well-established basis for doing so is when the class certification order is inconsistent with a subsequent appellate decision.  *See, e.g.*, *Doe v. Karadzic*, 192 F.R.D. 133, 137-39 (S.D.N.Y. 2000) (decertifying a previously certified class "based on the guidelines set forth" in an subsequent Supreme Court opinion); *Brady v. Deloitte & Touche LLP*, No.

---

[1] AMF initially alleged 89 misstatements regarding three of Celgene's drugs—GED-0301, Otezla, and Ozanimod—but all that remains in this case is one statement concerning Otezla and six concerning Ozanimod.

C 08-177, 2012 WL 1059694 (N.D. Cal. Mar. 27, 2012) (granting defendant's motion

to decertify a previously certified class "in light of" subsequent decisions from the

Ninth Circuit and Supreme Court).  Here, based on the Supreme Court's recent

decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct.

1951 (2021), Defendants respectfully submit that the Court should modify its class

certification order so that the class period ends on February 27, 2018, instead of April

27, 2018.

## BACKGROUND

### A.    Plaintiff's Claims

This motion is narrow in scope, concerning only AMF's allegations about

Ozanimod.[2]  AMF alleges that Defendants' statements that Celgene intended to

submit a new drug application ("NDA") for Ozanimod in 2017 were false or

misleading, even though Celgene did in fact submit the NDA in 2017, because

Celgene failed to disclose that it had identified a metabolite—a chemical byproduct

created when the body breaks down a drug—of Ozanimod that required additional

testing (the "Metabolite").  AMF contends that, without that testing, the NDA was

sure to be rejected by the FDA.

According to AMF, the purportedly fraudulent nature of Defendants'

statements was revealed in two allegedly corrective disclosures—Celgene's February

---

[2] This motion will be unaffected by any ruling on AMF's pending motion for leave to file a Third Amended Complaint.  *See* Dkt. Nos. 135, 136.

27, 2018 announcement that the FDA had refused to accept the Ozanimod NDA for

filing, and an April 29, 2018 Morgan Stanley analyst report predicting (incorrectly) that

the need for additional Metabolite testing could delay resubmission of the Ozanimod

NDA for another 1-3 years.

### B.    The Court's Class Certification Ruling

At class certification, in an effort to satisfy Rule 23(b)(3)'s requirement that

issues common to the class predominate over individualized ones, AMF invoked the

fraud-on-the-market presumption of reliance from *Basic Inc. v. Levinson*, 485 U.S. 224

(1988), under which reliance—traditionally an individualized element of liability—can

be presumed on a class-wide basis for stock purchases made in an efficient market.

But the *Basic* presumption is not conclusive.  It can be rebutted by "any showing that

severs the link between the alleged misrepresentation and . . . the price received (or

paid) by the plaintiff."  *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573

U.S. 258, 269 (2014) (brackets and internal quotation marks omitted).  One way

defendants can rebut the *Basic* presumption is by showing "that the alleged

misrepresentation did not actually affect the stock's price—that is, that the

misrepresentation had no 'price impact.'"  *Id.* at 263-64.

As the vast majority of the alleged Ozanimod misstatements at issue were not

associated with a statistically significant stock price increase at the time they were

made ("front-end price impact"), AMF argued that these statements instead

maintained Celgene's stock price at an artificially inflated level (the "price

maintenance" theory).  Under this theory, AMF argued that price impact is demonstrated by the decline in the price of Celgene stock that occurred when the purported truth was revealed to the market in the two alleged corrective disclosures described above ("back-end price impact"):  Celgene's February 27, 2018 announcement, and Morgan Stanley's April 29, 2018 report.

Defendants contested, among other things, that the price decline following the April 29, 2018 Morgan Stanley report demonstrated back-end price impact.  In particular, Defendants argued that they had rebutted the *Basic* presumption of reliance for all purchases made after the February 27, 2018 disclosure of the FDA's rejection of the Ozanimod NDA filing—such that any class period should end on that date— because the April 29, 2018 Morgan Stanley report was not actually a corrective disclosure.[3]  In support, Defendants submitted evidence showing that this report's speculative prediction of a 1-3 year delay in resubmitting the Ozanimod NDA was based exclusively on information that had been previously publicly disclosed.  *See, e.g.*, Dkt. No. 95 at 30-38 & Dkt. Nos. 95-18 through 95-27.  Defendants also demonstrated that Morgan Stanley published another report only three days later

---

[3] Defendants also argued that the class should not include such purchases because the February 27, 2018 announcement that the FDA had refused to accept the Ozanimod NDA fully corrected the alleged Ozanimod fraud, and therefore investors who purchased Celgene stock after that announcement could no longer have relied on the alleged misstatements.

4

revising its prediction of a 1-3 year delay downward to "1-1.5yrs," which was consistent with the prior predictions of other analysts.  Dkt. No. 95-26.

The Court declined to consider this evidence on the basis of its understanding that Defendants had "the burden to prove a lack of price impact through *direct evidence*."  Class Cert. Opinion at 23 (quoting *City of Sterling Heights Gen. Emps'. Ret. Sys. v. Prudential Fin., Inc.*, No. 12-cv-5275, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015), and further citing *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, No. 13-cv-6731, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016)).  The Court described Defendants as "merely attack[ing] Plaintiff's expert report," instead of "provid[ing] their own evidence demonstrating that the market had already reacted to" the previously disclosed information "or otherwise explain[ing] why the price drop occurred on April 30," the trading day following Morgan Stanley's April 29, 2018 report.  *Id.*  The Court thus rejected Defendants' argument that the class period should end on February 27, 2018, and the Court certified a class consisting of "[a]ll persons and entities who purchased the common stock of [Celgene] between April 27, 2017 . . . and April 27, 2018, and were damaged thereby."  *Id.* at 25.[4]

---

[4]  The Court's decision was issued in late November 2020, approximately two weeks before the Supreme Court's December 11, 2020 grant of certiorari in *Goldman Sachs*. On December 14, after the Supreme Court granted certiorari in *Goldman Sachs*, Defendants sought permission from the Third Circuit to appeal under Federal Rule of Civil Procedure 23(f).  On March 2, 2021, the Third Circuit denied that request "without prejudice."  *See* 3d Cir. Case No. 20-8050, at Doc. No. 11.

### C.     The Supreme Court's *Goldman Sachs* Decision

On June 21, 2021, the Supreme Court issued its decision in *Goldman Sachs*, in which the Court addressed, for the first time, how the *Basic* presumption of reliance can be rebutted when, as here, the plaintiff relies on a price-maintenance (or inflation-maintenance) theory. *See* 141 S. Ct. 1951.[5] The *Goldman Sachs* "Plaintiffs allege[d] that Goldman maintained an artificially inflated stock price" through alleged misstatements "about its ability to manage conflicts" of interest. *Id.* at 1957. According to the plaintiffs, "once the truth about Goldman's conflicts came out, Goldman's stock price dropped and shareholders suffered losses." *Id.* The defendants responded by seeking to "rebut[] the *Basic* presumption through evidence that [their] alleged misrepresentations actually had no impact on [Goldman's] stock price." *Id.* The district court and Second Circuit, however, both concluded that the defendants "failed to carry [their] burden of proving a lack of price impact," and granted and affirmed class certification respectively. *Id.* In evaluating whether the defendants had rebutted the *Basic* presumption of reliance, the Supreme Court emphasized two points in particular that bear on this Court's class certification ruling.

First, the *Goldman Sachs* Court instructed that, "[i]n assessing price impact at class certification, courts 'should be open to *all* probative evidence on that question—

---

[5] The *Goldman Sachs* Court assumed without deciding that the price-maintenance theory is valid. *See* 141 S. Ct. at 1959 n.1. Defendants likewise do not concede the theory's validity.

qualitative as well as quantitative—aided by a good dose of common sense.'" *Id.* at 1960 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020)).  The Court made clear that "a court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Id.* at 1961.

Second, the *Goldman Sachs* Court held that the critical "final inference" of the price-maintenance theory—"that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.*  Under circumstances where "it is less likely that the [allegedly corrective] disclosure *actually corrected* the [earlier] misrepresentation, . . . there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* (emphasis added).

Because it had "sufficient doubt" about whether the Second Circuit had properly considered *all* evidence the defendants had advanced to rebut price impact, the *Goldman Sachs* Court vacated the judgment below and remanded with instructions that the Second Circuit should "take into account *all* record evidence relevant to price impact." *Id.*  On remand, the Second Circuit acknowledged "the Supreme Court's clarifications of the legal standard." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, __ F.4th __, 2021 WL 3776297, at *4 (2d Cir. Aug. 26, 2021).  In light of these clarifications and because it was "unclear" whether the district court had considered all evidence of a lack of price impact, the Second Circuit vacated the district court's class certification order and remanded for further proceedings. *Id.*  In so doing, the

Second Circuit instructed the district court to "consider all record evidence relevant to price impact and apply the legal standard as supplemented by the Supreme Court." *Id.*

## ARGUMENT

This Court of course did not have the benefit of *Goldman Sachs* when it granted AMF's motion for class certification. But the principles *Goldman Sachs* sets forth now require the class period to be modified to end on February 27, 2018.

### A. *Goldman Sachs* Requires Full Consideration of Defendants' Evidence Demonstrating that the April 29 Morgan Stanley Report Was Not a Corrective Disclosure.

In opposing class certification, Defendants presented ample evidence that the decline in the price of Celgene stock following the April 29, 2018 Morgan Stanley report did not represent back-end price impact because the Morgan Stanley report was not a corrective disclosure. As described in more detail below, Defendants' evidence, which included previously published analyst reports and other publicly available materials, demonstrated that Morgan Stanley's prediction of a 1-3 year delay for the resubmission of the Ozanimod NDA was a short-lived outlier that Morgan Stanley quickly revised to be consistent with earlier analyst predictions of shorter delays—and that, in any event, the April 29 prediction was based entirely on information that had previously been made public. *See, e.g.*, Dkt. Nos. 95-18 through 95-27. For these reasons, Defendants argued that the class period should end on February 27, 2018, the date of the first alleged corrective disclosure.

The Court, however, rejected Defendants' argument without consideration of the underlying evidence, reasoning—as some cases had held prior to *Goldman Sachs*—that "a defendant bears the burden to prove a lack of price impact through *direct evidence*." Class Cert. Opinion at 23 (internal quotation marks omitted). The Court held that Defendants were required to present evidence "demonstrating that the market had already reacted to news of the Metabolite or the delay caused by additional testing, or otherwise explain why the price drop occurred" after the April 29, 2018 Morgan Stanley report. *Id.*

*Goldman Sachs*, however, has since clarified that, "[i]n assessing price impact at class certification, courts 'should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" 141 S. Ct. at 1960 (quoting *Allstate*, 966 F.3d at 613 n.6). Indeed, "a court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Id.* at 1961. Thus, regardless of how Defendants' evidence demonstrating that the April 29 Morgan Stanley report was not a corrective disclosure is characterized (*i.e.*, "direct" or "indirect" evidence of a lack of price impact), under *Goldman Sachs*, the Court should nonetheless consider it in evaluating whether

Defendants have rebutted the *Basic* presumption of reliance.  Defendants respectfully request that the Court do so now.[6]

**B.**     **Because the April 29 Morgan Stanley Report Was Not a Corrective Disclosure, There Is No Basis to Infer Price Impact from the Stock Drop Following That Report.**

When Defendants' evidence is fully considered, the April 29, 2018 Morgan Stanley report cannot qualify as a corrective disclosure, because Morgan Stanley simply used already-public information to offer a guess at when Celgene would be able to resubmit the Ozanimod NDA that was more pessimistic than the predictions already in the market—and then revised its own prediction only three days later, making it consistent with those earlier predictions.

---

[6] In light of *Goldman Sachs*, moreover, the Court should not require evidence "demonstrating that the market had already reacted to news of the Metabolite or the delay caused by additional testing, or otherwise explain[ing] why the price drop occurred" after the April 29, 2018 Morgan Stanley report.  *See* Class Cert. Opinion at 23.  In any event, the parties agree that Celgene's stock traded in an efficient market at all relevant times, *see* Dkt. No. 94-15 (Tabak Dep.) at 80 (AMF's expert stating that "the semi strong form of market efficiency pertains to this case"); *see also* Dkt. No. 90-2 (Tabak Report) ¶ 59 (AMF's expert stating that "the evidence strongly supports a finding of market efficiency for Celgene's common stock during the Class Period")—and, "in an efficient market, information important to reasonable investors (in effect, the market) is *immediately incorporated* into stock prices," *United States v. Schiff*, 602 F.3d 152, 174 (3d Cir. 2010) (brackets and internal quotation marks omitted) (emphasis added); *see also* Dkt. No. 94-15 (Tabak Dep.) at 80 (AMF's expert agreeing that the semi-strong form of market efficiency "requires that the price of a stock rapidly incorporates all public information").  Thus, the market necessarily had already incorporated the news of the Metabolite and the potential delay caused by additional testing into the price of Celgene's stock prior to the April 29 Morgan Stanley report.

Courts have recognized that back-end price impact can be disproved (and the *Basic* presumption rebutted) with evidence that the "alleged corrective disclosure is . . . merely speculative or negative commentary." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580, 2019 WL 5287980, at *23 (S.D.N.Y. Oct. 18, 2019) (Scheindlin, Special Master), *report and recommendation adopted in relevant part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).  That remains true even if the allegedly corrective disclosure provides new "expert analysis" of previously disclosed facts, because such "repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013).  As the Eleventh Circuit has explained, "if the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released *is the opinion itself*," which cannot be a corrective disclosure.  *Id.*; *see also, e.g.*, *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) (a report that merely analyzes previously available data that did not move the market "in the period immediately following [its] disclosure" is not corrective (internal quotation marks omitted)); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 295 (D. Minn. 2018) (report that analyzed a prior disclosure but "did not present any new facts to the market" was not corrective); *Stein v. Tangoe, Inc.*, No.

11

13-cv-286, 2014 WL 12767210, at *22-24 (D. Conn. Sept. 30, 2014) (rejecting claim that an analyst report was a corrective disclosure because it was based entirely on previously public information).[7]

Under these principles, and as clarified by *Goldman Sachs*, Defendants' evidence—whether deemed "direct" or "indirect"—establishes that the April 29, 2018 Morgan Stanley report cannot qualify as a corrective disclosure.  The only portion of this report that AMF claims was corrective is Morgan Stanley's prediction of a delay of up to three years for Celgene to resubmit the Ozanimod NDA.  *See* Dkt. No. 94-15 (Tabak Dep.) at 21-22; Compl. ¶ 502 (noting that analysts attributed the decline in the price of Celgene's stock to this prediction by Morgan Stanley).  But analysts had *already* projected delays to resubmit the Ozanimod NDA prior to the April 29 Morgan Stanley report.  Some analysts even did so immediately after Celgene's February 27 announcement of the NDA's rejection.  *E.g.*, Dkt. 95-18 (RBC Capital Markets 2/27/18 Report).  Several such predictions were made or reaffirmed on April 26,

---

[7] Several new cases that post-date Defendants' opposition to class certification reiterate this point.  *See, e.g.*, *Lau v. Opera Ltd.*, __ F. Supp. 3d __, 2021 WL 964642, at *12 (S.D.N.Y. Mar. 13, 2021) (a "corrective disclosure must 'purport[] to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint,'" and "'[a]lready-public information cannot constitute a corrective disclosure" (quoting *Omnicom*)); *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 71 (D. Del. 2020) ("'a corrective disclosure obviously must disclose *new* information,'" which cannot happen where "'the sources used in the [alleged corrective disclosure] were already public'" (quoting *Meyer*)); *In re Nektar Therapeutics*, No. 18-cv-6607, 2020 WL 3962004, at *18 (N.D. Cal. July 13, 2020) ("'the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure'" (quoting *Meyer*)).

following Celgene's disclosure of the Metabolite at an April 25, 2018 presentation at the annual American Academy of Neurology ("AAN") meeting.  For example, pointing to FDA guidance, Jefferies suggested on April 26 that the "FDA would want more information which could cause push-out" of Ozanimod's timeline by 1-2 years. Dkt. No. 95-23 (Jefferies 4/26/18 Report) at 1.  Similarly, Guggenheim noted that it had already "pushed out [its] ozanimod sales forecast by 2 years to 2020 from 2018." Dkt. No. 95-22 (Guggenheim 4/26/18 Report) at 1.  Along similar lines, RBC Capital Markets indicated that it would "remain at our base case ~1yr delay," and that Celgene's "shares still look[ed] to reflect negative scenarios."  Dkt. No. 95-24 (RBC Capital Markets 4/26/18 Report) at 1.  Notably, AMF does not contend that any of these reports were corrective disclosures.

Although Morgan Stanley's April 29, 2018 report predicted a longer potential delay of up to three years to resubmit the Ozanimod NDA, on May 2, 2018—only three days later—Morgan Stanley published a follow-up report acknowledging that "current expectations have now shifted to a refiling in 1H19 [the first half of 2019]" (*i.e.*, in about a year), and noting that the two experts with whom it consulted predicted delays that "overlapped at 1-1.5yrs."  Dkt. No. 95-26 (Morgan Stanley 5/2/2018 Report).  In other words, Morgan Stanley's follow-up May 2 report acknowledged that its April 29 prediction of a potential delay of up to three years was inaccurate and that it was adjusting its prediction to be consistent with the previous

13

predictions of other analysts.  *Id.*[8]  When considered in context, as *Goldman Sachs*

requires, Morgan Stanley's April 29, 2018 prediction of a 1-3 year delay thus could not

be a corrective disclosure, because it did not "actually correct[]" any alleged

misstatement.  *See Goldman Sachs*, 141 S. Ct. at 1961.

In any event, Morgan Stanley's prediction of a 1-3 year delay also cannot have

been a corrective disclosure because it rested entirely on already-disclosed

information.  In particular, Morgan Stanley's prediction was based solely on

(i) Celgene's identification of the Metabolite; (ii) Morgan Stanley's "prior review of

FDA guidance on metabolites"; (iii) posters presented at AAN annual meetings in

2013 and 2014, which Morgan Stanley described as "previously published . . . results

and studies" about animal exposure to Ozanimod metabolites; and (iv) a 2013 SEC

filing by Receptos (the company Celgene had purchased to acquire Ozanimod).  Dkt.

No. 95-16 (Morgan Stanley 4/29/18 Report) at 1-3.  As detailed below, Defendants'

evidence showed that all of this information had previously been disclosed publicly.

To begin, as noted above, Celgene disclosed the Metabolite's existence and

identity at an AAN annual meeting on April 25, 2018.  Compl. ¶ 495.  At that

meeting, Celgene also disclosed that the Metabolite was responsible for approximately

90% of the effect of Ozanimod, that the Metabolite was "first identified . . . in a

---

[8] Even Morgan Stanley's revised prediction, however, turned out to be unduly
pessimistic, as Celgene submitted the new Ozanimod NDA less than a year later, in
March 2019.  Dkt. No. 95-4.

human mass balance study conducted in parallel with the Phase III Ozanimod trials, [and] that the Metabolite levels were much lower in the animal species used in the non-clinical studies than in humans." *Id.*

Analysts reacted immediately to Celgene's disclosure of the Metabolite.  For example, on April 26, Morgan Stanley itself reported that, at the AAN meeting, Celgene disclosed "an active metabolite for Ozanimod" that "was first discovered in a human mass balance study conducted during the [Phase III] program," and "was not discovered earlier because the levels were very low in animals."  Dkt. No. 95-20 (Morgan Stanley 4/26/18 Report #1) at 1.  Indeed, even before Celgene's April 25 disclosure, some analysts had already anticipated that Ozanimod might have a significant metabolite.  Dkt. 95-18 (RBC Capital Markets 2/27/18 Report); Dkt. No. 95-19 (Evercore 2/28/18 Report); *see also* Dkt. 95-2 (Gompers Rep.) ¶ 33.

Other analysts also immediately recognized the import of Celgene's April 25 announcement.  On April 26, Guggenheim observed that Celgene had announced the identity of a "major metabolite" that was "responsible for ~90% of the efficacy and safety demonstrated in the Ozanimod [Phase III] program," and that "[l]evels of [this metabolite] produced in animal species were much less than those produced in human subjects."  Dkt. No. 95-22 (Guggenheim 4/26/18 Report) at 1.  That same day, Jefferies and RBC Capital Markets made similar observations.  *See* Dkt. No. 95-23 (Jefferies 4/26/18 Report) at 1 ("levels were much lower in the animal species used in the non-clinical studies than the amount produced by humans"); Dkt. No. 95-24

15

(RBC Capital Markets 4/26/18 Report) at 1 ("importantly levels are much lower in animals").

As for the other materials cited in Morgan Stanley's purportedly corrective April 29 report, Morgan Stanley's "prior review of FDA guidance on metabolites" simply referred back to a report Morgan Stanley had previously issued on April 26, 2018. *See* Dkt. No. 95-21 (Morgan Stanley 4/26/18 Report #2) at 1. The 2013 Receptos SEC filing cited in the April 29 report was also publicly disclosed. Dkt. No. 95-25. Finally, AMF's own expert admitted that the posters presented at the AAN annual meetings in 2013 and 2014—earlier instances of the same meeting at which Celgene disclosed the Metabolite in 2018—were also publicly available. Dkt. No. 94-15 (Tabak Dep.) at 24-25; *see also* Dkt. No. 94-1 (Yadava Decl.) ¶ 19. Indeed, Morgan Stanley indicated that it was able to locate the posters "over the weekend" and included hyperlinks to them in its April 29 report. Dkt. No. 95-16 (Morgan Stanley 4/29/18 Report) at 1.[9]

---

[9] In its reply brief in support of class certification, AMF argued that Morgan Stanley's April 29, 2018 report was corrective because it was based on allegedly new information found in these 2013 and 2014 AAN posters. *See* Dkt. No. 99 at 23-26; *see also* Compl. ¶¶ 499-500 (describing the posters as containing "certain obscure data"). But these posters were hardly "obscure" when they were presented at AAN annual meetings and remained public afterwards. And all that Morgan Stanley purportedly deduced from the posters was that "exposure of [the Metabolite] in animal models was likely below a relevant human therapeutic dose," Dkt. No. 95-16 (Morgan Stanley 4/29/18 Report) at 2, which the market already knew from Celgene's April 25 disclosure, as was reflected by Morgan Stanley and other analysts then immediately reporting that the Metabolite "was first discovered in a human mass balance study"

Once fully considered in light of *Goldman Sachs*, this evidence establishes that Morgan Stanley's April 29 report, apart from any other shortcomings, consisted of nothing more than analyst commentary based on previously available facts. As a matter of law, this cannot have been a corrective disclosure. *See, e.g.*, *In re Chi. Bridge*, 2019 WL 5287980, at *23 ("speculative or negative commentary" is not a corrective disclosure); *Meyer*, 710 F.3d at 1199 (same, with respect to "expert analysis" (internal quotation marks omitted)); *In re Omnicom Grp.*, 597 F.3d at 512 (same, with respect to "negative journalistic characterization of previously disclosed facts"); *Medtronic*, 325 F.R.D. at 295 (same, with respect to "analysts' reports" that "did not present any new facts to the market"); *Stein*, 2014 WL 12767210, at *22-24 (same, with respect to reports containing "a mere negative recharacterization of already public information"). And under *Goldman Sachs*, therefore, one cannot "infer front-end price inflation—that is, price impact—from the back-end price drop" following the April 29, 2018 Morgan Stanley report. 141 S. Ct. at 1961 (explaining that there is "less reason" to infer price inflation when it is "less likely" that the disclosure "actually corrected" an earlier misrepresentation). Accordingly, Defendants have rebutted the

---

and "was not discovered earlier because the levels were very low in animals." *See* Dkt. No. 95-20 (Morgan Stanley 4/26/18 Report #1) at 1; *see also* Dkt. No. 95-22 (Guggenheim 4/26/18 Report) at 1 (similar); Dkt. No. 95-23 (Jefferies 4/26/18 Report) at 1 (similar); Dkt. No. 95-24 (RBC Capital Markets 4/26/18 Report) at 1 (similar). Moreover, the fact that Morgan Stanley revised its prediction of a 1-3 delay downward to be consistent with the prior consensus of a delay of 1-1.5 years underscores that, in the end, the 2013 and 2014 AAN posters contained no significant new information.

*Basic* presumption of reliance as to all transactions occurring after February 27, 2018.

The class period should be shortened accordingly.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should modify the class period to end on

February 27, 2018, rather than April 27, 2018.

Dated: August 30, 2021                    Respectfully submitted,


                                          */s/ Lawrence S. Lustberg*

                                          Lawrence S. Lustberg
                                          Kate E. Janukowicz
                                          **Gibbons P.C.**
                                          One Gateway Center
                                          Newark, New Jersey 07102-5310
                                          Tel: (973) 596-4500
                                          Fax: (973) 596-0545

                                          Robert C. Micheletto
                                          Nina Yadava
                                          Rajeev Muttreja
                                          **Jones Day**
                                          250 Vesey Street
                                          New York, New York 10281
                                          Tel: (212) 326-3690
                                          Fax: (212) 755-7306

                                          *Attorneys for Defendants*