**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

*In re* CELGENE CORPORATION
SECURITIES LITIGATION

Civil Action No. 18-4772

**OPINION & ORDER**

**John Michael Vazquez, U.S.D.J.**

This class action concerns allegations of securities fraud. Lead Plaintiff AMF Pensionsforsakring, AB ("AMF" or "Plaintiff") asserts that Defendant Celgene Corporation ("Celgene") and several of its key officers and/or employees engaged in fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and Rule 10b-5 due to material misstatements and omissions as to two drugs in Celgene's pipeline. On November 29, 2020, the Court granted Plaintiff's motion to certify a Federal Rule of Civil Procedure 23(b)(3) class consisting of purchasers of Celgene's common stock between April 27, 2017, and April 27, 2018. D.E. 114 ("Prior Opinion" or "Prior Op."), 115. Currently pending before the Court is Defendants' motion to modify the class period. D.E. 151. The Court reviewed the parties' submissions in support and in opposition[1] and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Defendants' motion is **DENIED**.

---

[1] The Court refers to Defendants' moving brief as "Defs. Br.," D.E. 151-1; Plaintiff's opposition as "Plf. Opp," D.E. 162; and Defendants' reply as "Defs. Reply," D.E. 165.

I.    INTRODUCTION

The current motion pertains to Ozanimod, a drug in Celgene's portfolio. The Court does not provide a detailed factual recitation and instead incorporates by reference the factual section from the Prior Opinion. As a result, the Court only briefly reviews relevant facts here and discusses certain additional facts in the analysis section below.

Ozanimod is product in Celgene's Inflammatory & Immunology ("I&I") pipeline, and was initially developed by a different company, Receptos. TAC ¶¶ 4, 6, 217.[2] On July 14, 2015, Celgene purchased Receptos for $7.2 billion. In announcing the acquisition, Celgene "projected annual Ozanimod sales of up to $6 billion." *Id.* ¶ 218. Ozanimod was not approved by the U.S. Food and Drug Administration ("FDA") when Celgene acquired Receptos. Celgene anticipated filing a New Drug Application ("NDA") for Ozanimod in 2017. *Id.* ¶¶ 222, -27.

Through a Phase I trial that Celgene started in October 2016, Celgene identified a metabolite called CC112273 (the "Metabolite"), which triggered the need for the additional testing before FDA approval. *See, e.g.*, *id.* ¶¶ 247, 254-60. Despite the need for additional testing, Defendants continued to represent that Celgene was on track to submit the NDA before the end of 2017 and failed to disclose the Metabolite discovery. *See, e.g.*, *id.* ¶¶ 296, 300-03. Even after the FDA expressly informed Celgene that it needed to include the Metabolite testing results with its NDA submission, Celgene moved forward with its plan to submit the NDA without the Metabolite

---

[2] AMF filed the Third Amended Complaint ("TAC"), D.E. 175, after Judge Clark granted AMF's motion for leave to file an amended consolidated class action complaint. D.E. 173. Defendants appealed Judge Clark's decision, and their appeal is currently pending before this Court. D.E. 180. Because it is the operative pleading, the Court draws facts from the TAC despite the appeal. Moreover, Defendants concede that the issues addressed in this motion are "unaffected by any ruling on AMF's . . . motion for leave to file a Third Amended Complaint." Defs. Br. at 2 n.2.

study results. *Id.* ¶¶ 313-17, 333. Celgene submitted the Ozanimod NDA in December 2017 as planned. *Id.* ¶ 334.

On February 27, 2018, Celgene disclosed that it had received a refuse to file ("RTF") letter from the FDA in response to the NDA submission. An RFT letter indicates that the FDA "identifie[d] clear and obvious deficiencies" in the NDA. *Id.* ¶¶ 340-41, 346. As a result of the RFT announcement, Celgene's common stock fell from $95.78 per share on February 27, 2018 to $87.12 per share on February 28, 2018. *Id.* ¶ 349. Then on April 29, 2017, Plaintiff alleges that the market learned, through a Morgan Stanley report, that additional testing on the Metabolite was required, which could delay the refiling of the Ozanimod NDA by up to three years. *Id.* ¶ 358. Celgene's common stock fell again, from $95.78 per share on April 27, 2018, to $87.10 per share on April 30, 2018. *Id.*

On September 26, 2018, this Court consolidated two related cases; appointed AMF as the Lead Plaintiff; and appointed class counsel. D.E. 36. AMF filed the Second Amended Complaint on February 27, 2019, alleging (i) violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and (ii) violations of Section 20(a) of the Exchange Act against Defendants Alles, Kellogg, Smith, Curran, Hugin, and Fouse. D.E. 57. On February 8, 2019, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). D.E. 52. The Court dismissed Plaintiff's Section 20(a) claim and narrowed the Section 10(b) and Rule 10b-5 claim, as it determined that many of the alleged misrepresentations and omissions were not actionable. D.E. 75, 76.

Plaintiff then filed its motion to certify a class, D.E. 90, which Defendants opposed, D.E. 94-96. On November 29, 2020, this Court granted Plaintiff's motion, certifying a Federal Rule of

Civil Procedure 23(b)(3) class consisting of purchasers of Celgene's common stock between April 27, 2017 and April 27, 2018. D.E. 114, 115.

Defendants filed the instant motion on August 30, 2021. Defendants seek to narrow the class period from an end date of April 27, 2018 to February 27, 2018. Defendants contend that this is appropriate because of *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, --U.S.--, 141 S. Ct. 1951 (2021), a recent decision from the Supreme Court. D.E. 151. Plaintiff opposes Defendants' motion.

## II.   LEGAL STANDARD & ANALYSIS

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Thus, district courts are required to reassess decisions about class certification as a case develops "to ensure that the class satisfies Rule 23." *Johnson v. GEICO Cas. Co.*, 672 F. App'x 150, 157 (3d Cir. 2016) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998)). A change in the applicable law may justify reassessing a class certification decision. *See, e.g.*, *Martinez-Santiago v. Pub. Storage*, 331 F.R.D. 94, 100 (D.N.J. 2019) (decertifying class in light of recent decision from the New Jersey Supreme Court); *Doe v. Karadzic*, 192 F.R.D. 133, 137 (S.D.N.Y. 2000) (reconsidering prior "decision to certify the plaintiff class in light of the Supreme Court's recent pronouncements on this important issue"). Defendants argue that two issues addressed in *Goldman Sachs* impact this Court's class certification decision, requiring the Court reassess its decision as to the class period. Defs. Br. at 6-7.

In *Goldman Sachs*, the Supreme Court considered two issues relating to the *Basic* presumption, which was set forth in the Supreme Court's decision in *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). The *Basic* presumption is a rebuttable presumption used to establish

4

reliance. *Goldman Sachs*, 141 S. Ct. at 1958. Reliance is an element of a Section 10(b) and Rule 10b-5 claim. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). The presumption is based on the theory that investors rely on a company's public misrepresentations when trading stock in an efficient market. *Basic,* 485 U.S. at 245-47. The presumption "has particular significance in securities-fraud class actions," because it "allows class-action plaintiffs to prove reliance through evidence common to the class." *Goldman Sachs*, 141 S. Ct. at 1958-59 (internal quotation omitted). The presumption is a vital tool to establish that common questions of law or fact predominate over individualized issues, which is a requirement for a Rule 23(b)(3) class. *Id.*

To establish reliance through the *Basic* presumption, a plaintiff must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 1958. A defendant may rebut the presumption "by showing that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 1959 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 284 (2014)). This is because "[i]f a misrepresentation had no price impact, then *Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'" *Id.* (quoting *Halliburton II*, 573 U.S. at 283).

In *Goldman Sachs*, the Supreme Court first explained that lower courts "should be open to *all* probative evidence" of price impact, including "qualitative as well as quantitative--aided by a good dose of common sense." *Id.* (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (6th Cir. 2020)) (emphasis in original). Moreover, the Supreme Court reiterated that "a court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant

to price impact." *Id.* (emphasis in original). This discussion in *Goldman Sachs* forms the basis of Defendants' instant motion. Specifically, Defendants maintain that this Court failed to consider all the relevant evidence of price impact when it concluded that Defendants failed to rebut the *Basic* presumption. Defs. Br. at 9-10. The second issue in *Goldman Sachs* was a clarification of defendant's burden in rebutting the presumption. The Supreme Court rejected the argument that a defendant only has a burden of production. Rather, the Court in *Goldman Sachs* concluded that a defendant "bears the burden of persuasion to prove a lack of price impact . . . by a preponderance of the evidence." *Goldman Sachs*, 141 S. Ct. at 1963. This issue also colors Defendants' arguments here.

### A. Class Certification Opinion

In the Prior Opinion, the Court determined that AMF presented a *prima facie* case establishing that the *Basic* presumption applies. To do so, AMF relied on a price maintenance theory. Nov. 29 Op. at 18-21. Under the price maintenance theory, "statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price."[3] *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017). "[P]rice impact is shown if, when the truth is revealed, the artificial inflation in the stock price (maintained as a result of a repeated misrepresentation) dissipated and the price of the

---

[3] The Third Circuit has not addressed if a plaintiff that invokes the *Basic* presumption can rely on a price maintenance theory. In addition, although the Supreme Court recognized that the plaintiffs were proceeding under a price maintenance theory in *Goldman Sachs*, it "expressed no view on [the theory's] validity or its contours." *Goldman Sachs*, 141 S. Ct. at 1959 n.1. In the Prior Opinion, the Court determined that the weight of authority and the persuasiveness of the reasoning demonstrate that Plaintiff can proceed under a price maintenance theory. Prior Op. at 21. Defendants do not challenge Plaintiff's use of the price maintenance theory in the instant motion.

6

stock fell." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-1580, 2019 WL 5287980, at *21 (S.D.N.Y. Oct. 18, 2019).

The Court then addressed whether Defendants rebutted the presumption. Amongst other things, Defendants argued that the April 29 Morgan Stanley report was not corrective because analysts already predicted multiyear delays for Ozanimod before this date, such that the market previously reacted to this news. Prior Op. at 22-24. Defendants relied on direct evidence, largely in the form of other analyst reports, in addition to their expert, Dr. Gompers. Dr. Gompers explained that the April 29 report was based on "previously published studies and FDA guidance," and Plaintiff's expert "acknowledged in deposition that he was also able to obtain the information that Morgan Stanley utilized to form its [April 29] opinion." *Id.* at 23-24 (quoting Yadava Decl., Ex. 1 at ¶ 44). This Court rejected Defendants' argument because Dr. Gompers' report was simply an attack on Plaintiff's expert report. *Id.* at 23.

Defendants contend that this conclusion was inappropriate, in light of the Supreme Court's explanation that a court must consider "*all* evidence relevant to price impact." Defs. Br. at 9 (quoting *Goldman Sachs Grp., Inc.*, 141 S. Ct. at 1961 (emphasis in original)). Moreover, Defendants maintain that *Goldman Sachs* indicates that they are not required to provide evidence demonstrating that the market previously reacted to information in the April 29 report. *Id.* at 10 n.6. While the Court agrees with Defendant's recitation of *Goldman Sachs* as to which evidence a court must consider, the Court disagrees that the Supreme Court's decision requires a review of the Prior Opinion. The only portion of the Prior Opinion that Defendants could conceivably challenge in light of *Goldman Sachs* is the Court's determination that Defendants merely attacked Plaintiff's expert report. Prior Op. at 23. In light of *Goldman Sachs*, the substantive attacks on Plaintiff's expert would seemingly be part of "all probative evidence" that a court must consider.

7

*Goldman Sachs*, 141 S. Ct. at 1959. But Defendants do not question this portion of the Prior Opinion. The Court never ruled in its Prior Opinion that it could not consider prior, publicly disclosed information. Thus, Defendants' motion is actually a motion for reconsideration to prevent what is, in Defendants' view, manifest injustice; that is, overlooking evidence submitted by Defendants at the time of the initial briefing. *See, e.g.*, *Carmichael v. Everson*, No. 03-4787, 2004 WL 1587894, at *1 (D.N.J. May 21, 2004) (setting forth the bases for a motion for reconsideration). However, Defendants' motion is well beyond the fourteen-day limit imposed by Local Civil Rule 7.1(h). For this reason, Defendants' motion is denied.

### B. Reanalysis of Defendants' Rebuttal Evidence[4]

Alternately, the Court also finds that Defendants fall short on the merits. The April 29 Morgan Stanley report opined that the Metabolite exposure levels in animal studies were "likely below a relevant human therapeutic dose." Yadava Decl., Ex. 16 at 1-2. The report predicted that because of this, Celgene would likely need to re-run preclinical toxicology studies that would cause a refiling delay of one to three years.[5] *Id.* at 1. To reach this conclusion, Morgan Stanley looked at "previously published Ozanimod pre-clinical toxicology and metabolite studies" from the 2013 and 2014 American Association of Neurology ("AAN") annual meetings, which addressed

---

[4] In considering all the evidence, the Court refers to exhibits filed in conjunction with Plaintiff's motion to certify a class. Plaintiff's exhibits were submitted through the Declaration of James E. Cecchi ("Cecchi Decl."), D.E. 99, and Defendants' exhibits were submitted through the Declaration of Nidhi (Nina) Yadava ("Yadava Decl."), D.E. 95.

[5] Celgene eventually confirmed that the RFT was expected to create a one-year delay during its 2018 Q1 investor call on May 4, 2018. Specifically, Jay T. Backstrom, M.D., Celgene's Chief Medical Officer at the time, stated that Celgene was targeting a new Ozanimod FDA submission for Q1 2019. TAC ¶¶ 47, 361. Celgene actually resubmitted the NDA on March 25, 2019 and the FDA approved it in March 2020. Yadava Decl., Ex. 4.

Ozanimod's other metabolites, and the Receptos S-1. Morgan Stanley also considered FDA guidance on metabolites. *Id.* at 1-4.

Defendants contend that Plaintiff only pleads that the corrective nature of the report is limited to the length of delay. Specifically, that Celgene could face a three-year delay. Defs. Br. at 12; Defs. Reply at 7-9. The Court finds this view of Plaintiff's position too narrow. Plaintiff pleads that Celgene's stock fell after the Morgan Stanley report "on the news of the significant additional testing required from Celgene and the significant delay for Ozanimod approval." TAC ¶ 451. Plaintiff further pleads that "[a]nalysts attributed this decline to the revelations that resulted from Morgan Stanley's detailed, specialized analysis and digestion of Celgene's informationally-complex AAN disclosure." *Id.* ¶ 452. This is confirmed by Plaintiff's expert, Dr. Tabak, who explained that the one to three-year delay and "statements leading up to that [delay] about essentially the degree that they thought the Metabolite might be found in animal studies" were the corrective disclosures. *See* Yadava Decl., Ex. 15 at 22. Accordingly, the Court considers both the length of the delay and the detailed analysis as potentially corrective.

Turning to the length of the delay, as soon as Celgene made the RFT news public, analysts speculated that the Ozanimod NDA would be delayed. *See, e.g.*, Yadava Decl., Ex. 18 (financial analyst report issued the same day as RFT news estimating that Ozanimod launch will be delayed by one year). In fact, on April 26, 2018, three days before the alleged corrective disclosure report, Morgan Stanley issued a different report about the Metabolite discovery, FDA guidance on the testing of metabolites, and the potential need for further animal studies. *Id.*, Ex. 21 at 1-2. The April 26 Morgan Stanley report also predicted that Celgene might face a two to three-year delay

9

in refiling.[6] *Id.* at 2. Multiple analysts issued similar reports on April 26, which all discussed a potential delay in filing of at least one year. *See Id.*, Ex. 22 (Guggenheim report pushing Ozanimod sales forecast out two years); Ex. 23 (Jefferies report discussing one to two-year delay); Ex. 24 (RBC Capital Markets report stating that it remains at its one-year delay prediction). Accordingly, this evidence demonstrates that April 29 report was not a corrective disclosure with respect to the length of the delay -- the likelihood of a one to three-year delay was already publicly disclosed, at a minimum, a few days prior to the April 29 report. Defendants, therefore, sever the link with respect to the length of delay as the corrective disclosure. *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *23 (explaining that "[i]f a court finds that the alleged corrective disclosure is [ ] not new . . . then the defendant will have 'severed the link'").

As for the "detailed analysis" aspect of the report, Plaintiff argues that the report disclosed that Celgene would be required to re-run certain toxicology studies because the "exposure of [the Metabolite] in animal models was likely below a relevant human therapeutic dose." Yadava Decl., Ex. 16 at 2. Unlike the delay, the other analyst reports Defendants highlight did not use the additional information that Morgan Stanley considered on April 29 (*i.e.*, the 2013 and 2014 AAN posters and S-1). *Compare id. with* Yadava Decl., Exs. 20-24. Therefore, the Court considers the information in the April 29 report as providing the market with new information. Specifically, why the additional studies were necessary, the type of studies and a more detailed timeline. *See* Yadava Decl., Ex. 16 at 1.

---

[6] Plaintiff maintains that the two to three-year prediction in the April 26 Morgan Stanley report should not be considered because Morgan Stanley noted that it was based on incomplete information. Plf. Opp. at 13. But every analyst report that the parties highlight is based on incomplete information. Namely, Celgene had not yet provided full information about the RFT or the Metabolite, so analysts were speculating about the Ozanimod NDA with available, albeit incomplete, information.

Defendants, however, maintain that the report is not new because Morgan Stanley used previously available information. Defs. Br. at 16. As discussed, Morgan Stanley relied, in part, on posters from 2013 and 2014 that addressed Ozanimod's other metabolites. In the report, Morgan Stanley explained that it was "able to locate copies of the posters over the weekend" and provided a link to the information. *Id.* at 1-2. Thus, Defendants argue that the report is "nothing more than analyst commentary based on previously available facts." Defs. Br. at 17. Plaintiffs counter that Defendants fail to establish that the posters were publicly available prior to the April 29 report. Plf. Opp. at 14-15. Defendants' expert, Dr. Gompers, did not try to obtain the posters referenced in the April 29 report. Cecchi Decl., Ex. 9 at 14. Plaintiff's expert, Dr. Tabak, explained that it took him "several days" to obtain copies of the posters, partially "because Morgan Stanley let us know what they were." Yadava Decl., Ex. 15 at 24-25. But this does not address whether the posters were publicly available before the April 29 report. Moreover, Morgan Stanley does not explain how it located or got access to the posters over the weekend. As a result, the Court cannot conclude that the posters were publicly available before the April 29 report.

In addition, "[p]rior cases reflect the understanding that some information, although nominally available to the public, can still be 'new' if the market has not previously understood its significance." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).[7] In opposition, Defendants cite to several cases to support their argument that an analyst's commentary or opinion using previously available information cannot amount to a corrective

---

[7] Defendants challenge this as a "looser standard" that does not line up with the efficient market hypothesis -- the underpinning of the *Basic* presumption. Defs. Reply at 13; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988) (explaining that the presumption is based on the economic theory "that the market price of shares traded on well-developed markets reflects all publicly available information," such that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price"). But Defendants' argument presumes that the posters were publicly available, which Defendants have not established.

11

disclosure because the market reacted to the information when it was first disclosed. *See* Defs. Br. at 11-12 & n.7; Defs. Reply at 11-12. But in each of these cases, there is no allegation that the analysts' conclusions or opinions led to "new" information.

Here, it appears that Morgan Stanley took public information (FDA guidance and the Receptos S-1) and (at most) "nominally" public information (the 2013 and 2014 AAN posters) to piece together a more detailed and new conclusion in comparison to other analysts. This amounts to a corrective disclosure. *In re BofI Holding*, 977 F.3d at 794, 797 (recognizing that there should be a "flexible approach to evaluating corrective disclosures" and that "[t]he time and effort it took to compile this information make[s] it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available"). Further, because the April 29 report synthesized information to reach a new opinion, the market reaction to the underlying information addressed in the report is not the same as the market reaction to the April 29 report itself. This is especially true because Defendants fail to establish that the AAN posters were even public information. Finally, the Court's conclusion is colored by the fact that "courts are required to cut off the Class Period on the date of a statement or event that cures the market. Where, however, there is an issue of fact as to whether a particular disclosure cured the market . . . a broader time period should be certified." Nov. 29 Op. at 22 (quoting *In re Chi. Bridge & Iron Co.*, 2019 WL 5287980, at *40).

In sum, it appears, more likely than not, that the April 29 report provided the market with new, corrective information about the Metabolite discovery. As discussed, Plaintiff alleges that because of the news of the significant additional testing, as addressed in the April 29 report, Celgene's common stock declined 4.5%. TAC ¶ 451. Although Defendants are not required to do so, they do not provide an alternative explanation for the stock drop. Moreover, "[a]nalysts

12

attributed this decline to the revelations that resulted from Morgan Stanley's detailed, specialized analysis and digestion of Celgene's informationally-complex AAN disclosure." *Id.* ¶ 452. "In assessing price impact at class certification, courts 'should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" *Goldman Sachs Grp., Inc.*, 141 S. Ct. at 1960 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d at 613 n.6). With this guidance, and considering all the evidence, the Court concludes that Defendants fail to sever the link between the alleged misrepresentations and the stock price. Defendants, therefore, do not rebut the *Basic* presumption of reliance after February 27, 2018.

## III.   CONCLUSION

For the reasons stated above, and for good cause shown,

**IT IS** on this 13th day of April, 2022,

**ORDERED** that Defendants' motion to modify the class period (D.E. 151) is **DENIED**; and it is further

**ORDERED** that because the Court relies on underlying documents that were filed under seal, this Opinion & Order shall initially be filed under seal. By April 20, 2022, the parties shall inform the Court, via a letter filed on the docket, if any portion of the Opinion & Order should remain under seal and the legal basis for doing so. If the Court does not receive any such submission, the Opinion & Order will be unsealed on April 21, 2022.

_____
John Michael Vazquez, U.S.D.J.

13