```
            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| In Re CELGENE CORPORATION, INC. SECURITIES LITIGATION | Civil Action No. 18-4772 (MEF)(JBC)<br><br>**OPINION and ORDER** |

                              *   *   *

I.   **Background**

     A.   **The Facts**

     B.   **The Lawsuit**

     C.   **Procedural History**

     D.   **The Motion**

     E.   **The Court's Approach**

II.  **Legal Standards**

     A.   **The Securities Exchange Act of 1934**

     B.   **Summary Judgment**

III. **The Defendants' Argument**

IV.  **The Chief Operating Officer**

V.   **The Other Individual Defendants**

VI.  **Conclusion**

                              *   *   *

Investors in a pharmaceutical company sued the company and some of its executives.

Their claim: certain public statements indicated the company was close to submitting a new drug application to regulators, even though the application was not well-enough developed; the application was submitted and rejected, and that caused the stock price to fall.

The company and certain executives now move for summary judgment.

The motion as to the company will be taken up in a separate opinion.

Here, the motion as to one of the executives is granted.  As to the remaining executives, the investors appear to have abandoned any objection they may have to the entry of summary judgment.

I.   **Background**

   A.   **The Facts**

The evidence as relevant for now is as follows.

A drug company ("the Company"[1]) spent a number of years developing a particular drug (the "Drug"[2]).  See Defendants' Statement of Material Facts Not in Dispute Pursuant to Local Civil Rule 56.1 ("Defendants' Rule 56 Statement") ¶¶ 3-4.

As part of doing so, the Company assessed the metabolites, if any, that use of the Drug might generate.  See id. at ¶ 13.

Metabolites are "the chemical byproducts of the body breaking down a drug."  Id. at ¶ 12.  They can sometimes impact the safety or efficacy of a drug, so the Food and Drug Administration ("FDA") considers metabolites when it decides whether to approve a new drug.  See id. at ¶ 22.

*   *   *

During 2017, two sets of things happened.

First, during the initial months of the year certain Company employees began to zero in on the possibility that the Drug potentially produced a particular metabolite.[3]  And by June, the

---

[1]  The Company is Celgene Corporation, Inc.  See Third Amended Consolidated Class Action Complaint (the "Complaint") at 1, ¶ 41.

[2]  The Drug is Ozanimod.  See Complaint ¶ 10.

[3]  See Declaration of James E. Cecchi in Support of Lead Plaintiff's Response Pursuant to Local Civil Rule 56.1 to Defendants' Statement of Material Facts Not in Dispute and Lead Plaintiff's Supplemental Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1 (the "Cecchi Decl."), Ex. 18 at CELG-AMF 00967643 (January 2017 meeting minutes from the "[Drug] Team"); Cecchi Decl., Ex. 21 at CELG-AMF 01229071

metabolite's existence was said to have been "definitively confirmed."[4]

Second, the Company put out a series of public statements, describing the Drug application it was gearing up to submit to the FDA. See Complaint ¶¶ 397-399, 403, 405-408, 411; cf. id. at ¶¶ 420, 422, 424; see also Defendants' Rule 56 Statement ¶¶ 37-38, 41, 43-44, 56. The gist of the statements: the Company would soon apply for FDA approval to market the Drug. See id.

\* \* \*

The Company filed the FDA application at the end of 2017,[5] but it was bounced a couple of months later, in February of 2018. See id. at ¶¶ 62, 66-69.[6]

Per the FDA: the application was too sparse. It did not lay out enough information as to the metabolite testing and what it had shown. See Cecchi Decl., Ex. 78 at CELG-AMF_01420920-23.

After the FDA's decision, the Company's stock price fell, by around 8.5%. See Lead Plaintiff's Supplemental Statement of Disputed Material Facts Pursuant to Local Civil Rule 56.1 (the "Plaintiffs' Rule 56 Statement") ¶ 117; Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment (the "Motion for Summary Judgment") at 13.

---

("[Drug] Stakeholders" "NDA Submission Dashboard for the week of Mar 27th [2017]").

[4] See Declaration of Nidhi Yadava in Support of Defendants' Motion for Partial Summary Judgment (the "Yadava Decl."), Ex. 21 at CELG-AMF 01303197 (June 22, 2017 email to key members of the Company's Drug development team: "We have definitively confirmed [a metabolite] as the peak in human plasma.").

[5] The application was a New Drug Application. See generally In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig., 967 F.3d 264, 267 (3d Cir. 2020) (describing the New Drug Application process).

[6] The FDA issued a Refusal to File. See Defendants' Rule 56 Statement ¶ 66. A Refusal to File cuts things off at the pass. It is "a regulatory decision from the FDA denying the complete review of a[] [New Drug Application]." Defendants' Rule 56 Statement ¶ 15.

3

### B. <u>The Lawsuit</u>

Emphasizing alleged daylight between external statements (the application is coming) and internal information (it might not be far enough along), some investors sued in 2018 on behalf of a putative class of Company stockholders.  <u>See</u> Complaint ¶¶ 22-35, 473.

From here, these investors are referred to as "the Plaintiffs."

The Plaintiffs sued under the Securities Exchange Act of 1934 (the "Act").  <u>See</u> Complaint ¶¶ 36, 488-492.

The lawsuit was in one count, based on Section 10(b) of the Act and Rule 10b-5.[7]  <u>See</u> <u>id</u>. at ¶¶ 488-489.

### C. <u>Procedural History</u>

The suit moved forward.  A class was certified, <u>see</u> Order (November 29, 2020), discovery got underway and wrapped up, and during the fall of 2023, the Court, per Judge Vazquez, ruled on the defendants' summary judgment motion, granting it in part and denying it in part.  <u>See</u> Order (September 8, 2023).  Judge Vazquez indicated that part of the denial was without prejudice --- that is, a part of the summary judgment motion could be later renewed.  <u>See</u> <u>id</u>. at 2.

Judge Vazquez retired, and the case was definitively reassigned to the undersigned, during January of 2024.

### D. <u>The Motion</u>

The Company[8] and certain Company employees[9] have now renewed their summary judgment motion.  (The Company and the Company employees are referred to here, collectively, as "the Defendants.")

---

[7] "Rule 10b-5 implements section 10(b) of the Securities Exchange Act."  <u>Riley</u> v. <u>Simmons</u>, 45 F.3d 764, 773 n.9 (3d Cir. 1995); <u>see</u> <u>also</u> <u>Globis Cap. Partners, L.P.</u> v. <u>Stonepath Grp., Inc.</u>, 241 F. App'x 832, 835 (3d Cir. 2007) (the Act's "[S]ection 10(b) . . . is enforced through Rule 10b-5").

[8] Recall: Celgene Corporation, Inc.  <u>See</u> footnote 1.

[9] Scott Smith, Terrie Curran, and Philippe Martin.  Each is a named defendant.  <u>See</u> Complaint ¶¶ 43-45.

4

Oral argument was held, and the summary judgment motion became fully submitted around 8 weeks ago.

### E. The Court's Approach

To analyze the summary judgment motion, the Court starts by laying down the general legal standards that apply here. See Part II.

The Court then describes the Defendants' motion, concluding that the Plaintiffs resist the entry of summary judgment as to one individual defendant (the Company's former Chief Operating Officer) but seemingly not as to the other individual defendants. See Part III.

Accordingly, the Court does two things.

First, it assesses the Defendants' summary judgment motion as to the former Chief Operating Officer --- and concludes it should be granted. See Part IV.

Second, the Court assesses the Defendants' summary judgment motion as to the remaining individual Defendants, and concludes that, as to them, the motion should likely be granted --- subject to further submissions the parties will be permitted to make. See Part V.

## II. Legal Standards

Take up, first, the general legal standards that are in play here.

These focus on two questions. First, what must the Plaintiffs' evidence prove? See Part II.A. And second, how should the Court assess an argument like the Defendants' --- namely, an argument that the Plaintiffs' evidence does not measure up, that it does not prove what it must. See Part II.B.

### A. The Securities Exchange Act of 1934

As noted, see Part I.B, the Plaintiffs sued under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

To prove a 10b-5 claim, the Plaintiffs must establish "six elements: (i) a misrepresentation or omission of material fact; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss

5

causation." City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc., 70 F.4th 668, 679 (3d Cir. 2023).

### B. Summary Judgment

The Defendants have moved for summary judgment. See Part I.D.

Such a motion should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Dupree v. Younger, 598 U.S. 729, 737 (2023); Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 100 (3d Cir. 2023).

"A factual dispute is material if it might affect the outcome of the suit under the governing law." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Such a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 203-04 (3d Cir. 2022).

In assessing a summary judgment motion, "a district court may not make credibility determinations or engage in any weighing of the evidence[.]" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004). Rather, the court must "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor." Canada, 49 F.4th at 345 (cleaned up); accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).

### III. The Defendants' Argument

To make out a 10b-5 claim, see Part II.A, a plaintiff must prove, among other things, that a material misrepresentation or omission was made by the defendant.

Here, the Defendants move for summary judgment on the ground that 10b-5 liability cannot be based on ten of the misrepresentations identified in the Complaint.[10]

---

[10] Note: the Defendants initially sought summary judgment as to thirteen statements. See Motion for Summary Judgment at 1-2 n.1. After oral argument, the Plaintiffs walked away from three

6

For now, zero in on where the asserted misrepresentations publicly appeared, and when.

| Statement | Where | When | Source |
|---|---|---|---|
| 1 | Company 10-Q | July 27, 2017 | Complaint ¶ 397 |
| 2 | Conference Call | July 27, 2017 | Complaint ¶ 398-399 |
| 3 | Company 8-K | July 27, 2017 | Complaint ¶ 403 |
| 4 | Conference Presentation | September 26, 2017 | Complaint ¶ 405 |
| 5 | Company 10-Q | October 26, 2017 | Complaint ¶ 406 |
| 6 | Conference Call | October 26, 2017 | Complaint ¶ 407 |
| 7 | Press Release | October 26, 2017 | Complaint ¶ 411 |
| 8 | Press Release | January 8, 2018 | Complaint ¶ 420 |
| 9 | Company 8-K | January 25, 2018 | Complaint ¶ 422 |
| 10 | Company 10-K | February 7, 2018 | Complaint ¶ 424 |

As to these ten statements, the Plaintiffs have sued two sets of defendants.

First, as to each of the ten statements, the Plaintiffs claim the Company is liable.  See Opposition Brief at 15-25; Complaint ¶¶ 397, 398-399, 403, 405, 406, 407-408, 411, 420, 422, 424, 489, 491.

The Defendants' response: summary judgment should be granted, because the Company did not have scienter.  This argument will be taken up in a separate Opinion, to be issued during the coming weeks.

---

of these.  See Order (May 30, 2024).  That leaves the ten statements referenced in the text.

Second, as to each of the ten statements, the Plaintiffs initially seemed to claim that each of the three individual defendants is also liable.[11]  See Complaint ¶¶ 490-491.

Some of these claims plainly can no longer work --- because a particular statement was made at a time when, Judge Vazquez held, that individual defendant did not have scienter.  Compare, e.g., Complaint ¶¶ 489, 491 (alleging that the individual defendants, including Scott Smith, are liable for the July 27, 2017 statements) with Order (September 8, 2023) at 1 and Argument Transcript (September 7, 2023) at 104:6-11 (holding that Scott Smith did not have scienter at that point).

But the Defendants have nonetheless moved for summary judgment across the board --- as to each of the three individual defendants, and seemingly as to each of the ten above-listed statements.  See Motion for Summary Judgment at 1-2, 4 (noting that the Company, and all three individual defendants, are renewing their summary judgment motion --- and arguing that summary judgment is warranted "in favor of Defendants"); see also Defendants' Notice of Motion for Partial Summary Judgment at 2 (defining "Defendants" as the Company and the three individual defendants).

The Plaintiffs have opposed the Defendants' motion as to the individual defendants, but only to a limited extent.

In particular, the Plaintiffs oppose granting summary judgment as to Scott Smith, on statements 8, 9, and 10.  See Opposition Brief at 21-25.

But the Plaintiffs say little, if anything, that suggests that they oppose the Defendants' motion for summary judgment as to (a) Terrie Curran; (b) Philippe Martin; or (c) Scott Smith as to statements 1 through 7.

Given all this, the Court does two things.

First, the Court analyzes the Defendants' motion for summary judgment as to Scott Smith's asserted liability for statements 8, 9, and 10.  That is taken up just below, in Part IV.

And second, the Court assumes that the Plaintiffs no longer maintain that there can be liability here for either Curran or

---

[11]  Recall: the individual defendants are Scott Smith, Terrie Curran, and Philippe Martin.  See footnote 9.

8

Martin as to the ten listed statements, or for Smith as to statements 1 through 7. The implications of this are addressed in Part V.

### IV. **The Chief Operating Officer**

As noted, the Defendants move for summary judgment as to Scott Smith for statements 8, 9, and 10.

Because Scott Smith was at the relevant time the Company's Chief Operating Officer, he is referred to from here as "the Chief Operating Officer."

The stepping-off point for the summary judgment motion as to the Chief Operating Officer is this legal principle: to be liable under 10b-5, a defendant must have "made" the relevant statement. See Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 141 (2011); Williams v. Globus Med., Inc., 869 F.3d 235, 240 (3d Cir. 2017); In re Royal Dutch/Shell Transp., 2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006); see also 17 C.F.R. § 240.10b-5.

The Chief Operating Officer's argument is that he did not "make" statements 8, 9, or 10. See Motion for Summary Judgment at 16-19.

The Court's conclusion: this is persuasive.

To see why, canvas the core "maker" theories. These are the basic ways to link a person[12] to a statement --- such that the person can be legally responsible under 10b-5 for the statement's asserted failings.

Here, none of these fit the bill.

First, and most basically: the person in whose name a statement is made can be its "maker." See, e.g., City of Warren, 70 F.4th at 688; Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021); In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 662 (S.D.N.Y. 2017); In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig., 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (executive a

---

[12] An entity can also be a statement-maker. See Janus, 564 U.S. at 148; City of Warren, 70 F.4th at 688; In re Stillwater Cap. Partners Inc. Litig., 853 F. Supp. 2d 441, 460 (S.D.N.Y. 2012).

9

"maker" for statements where he "was quoted" in articles and reports).

But this gets no traction here.

Statements 8, 9, and 10 were included in Company SEC filings and a Company press release. See Complaint ¶¶ 420, 422, 424. These were not issued in the Chief Operating Officer's name. See Complaint ¶¶ 420, 422, 424; Defendants' Rule 56 Statement ¶ 65. Rather, they were issued in the name of the Company. See Complaint ¶¶ 420, 422, 424; Defendants' Rule 56 Statement ¶ 65.

Second, the person who signs a statement can count as the statement's "maker." See In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) (collecting cases); see also Camelot Event Driven Fund v. Alta Mesa Res., Inc., 2021 WL 1416025, at *11 (S.D. Tex. Apr. 14, 2021); City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011).

But the SEC filings and the press release were not signed by the Chief Operating Officer. See Complaint ¶¶ 420, 422, 424; Defendants' Rule 56 Statement ¶ 65; Yadava Decl., Exs. 60-62.

Third, and relatedly --- a person can sometimes be chalked up as a "maker" of a statement they affirm is true. See, e.g., U.S. S.E.C. v. Benger, 931 F. Supp. 2d 908, 911 (N.D. Ill. 2013) (individuals can qualify as "makers" where they, among other things, "adopted" the relevant statements); In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) (discussing ratification or approval); In re ATI Techs. Inc. Sec. Litig., 2007 WL 2301151, at *8 (E.D. Pa. Aug. 8, 2007) (company can be liable for third-party statement it "expressly" adopts or endorses); DeMarco v. DepoTech Corp., 149 F. Supp. 2d 1212, 1231 (S.D. Cal. 2001) (similar).

But that box is not checked here.

For example, the Chief Operating Officer was not asked to certify that the relevant statements were accurate --- as is sometimes required of certain corporate officers. See generally 15 U.S.C. § 78m, 78o(d); 17 C.F.R. § 240.13a-14(b)(2); cf. In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017) (officer who signs an SEC filing containing misrepresentations is a maker); In re Galena Biopharma, Inc. Sec. Litig., 117 F. Supp. 3d 1145, 1185 (D. Or. 2015) (similar); In re Urb.

Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 650 n.3 (E.D. Pa. 2015) (similar); In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012).

And another example: there is no evidence here of an internal process, of the kind some companies use, whereby employees attest in writing to the accuracy of information that relates to their span of control --- before that information is bucked over to those responsible for knitting together the company's public statements.[13]

Fourth, some courts have suggested that a person who exercises strong control over certain aspects of a document can become its "maker" for 10b-5 purposes.  See, e.g., Puddu v. 6D Glob. Techs., Inc., 2021 WL 1198566, at *8 (S.D.N.Y. Mar. 30, 2021); cf. Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 427 (7th Cir. 2015).

But even assuming arguendo this is an accurate statement of the law --- there is no indication of strong control by the Chief Operating Officer.

As to the SEC filings and the press release that contain statements 8, 9, and 10, the Plaintiffs point to no proof that the Chief Operating Officer directed anyone about what to say or how to say it.

Bottom line: the most commonly-invoked ways to show that a person "made" a statement are not in play as to the Chief Operating Officer.

*   *   *

Instead of leaning on these, the Plaintiffs mainly note that, like many large entities, the Company relied on a committee of senior employees to review draft SEC filings and to comment on them --- and the Chief Operating Officer was on the committee. This committee membership, the argument goes, renders him a "maker" of the statements in the SEC filings (and perhaps in the press release, too).  See Opposition Brief at 21-25; Cecchi Decl., Ex. 1, Deposition of Chief Operating Officer at 39:8-40:14 (describing the Chief Operating Officer's role reviewing SEC filings); id. at 27:11-29:9, 33:15-21 (describing the Chief

---

[13] Note: it is not crystal clear that such internal-affirmation evidence would make a difference.  See footnote 14.

11

Operating Officer's role reviewing accompanying communications, such as press releases).

But this does not change the picture.

The reason: evidence that a company employee has a role on a review-and-comment committee is not enough, standing alone, to make that employee a "maker" as to the statements that pass through the committee on their way to being publicly issued.

The caselaw is clear and uniform on this point. See, e.g., Gavin/Solmonese LLC v. D'Arnaud-Taylor, 639 F. App'x 664, 669 (2d Cir. 2016) ("approval and input [by the employee-defendant] is not sufficient to demonstrate the control essential to maker liability"); In re Turquoise Hill Res. Ltd. Sec. Litig., 625 F. Supp. 3d 164, 207 (S.D.N.Y. 2022) ("Janus rejected the notion that a party who reviews and comments on a statement is transformed into the 'maker' of that statement."); Xu v. Gridsum Holding Inc., 624 F. Supp. 3d 352, 360 (S.D.N.Y. 2022) (participation in creating a press release not enough to show employees were makers); Menora Mivtachim Ins. Ltd. v. Int''l Flavors & Fragrances Inc., 2021 WL 1199035, at *28 n.29 (S.D.N.Y. Mar. 30, 2021) ("allegation that [an executive] 'approved, reviewed, ratified, and furnished information and language for inclusion' in certain statements is insufficient to make [the defendant] the 'maker' . . . of statements . . . expressly attributed to other individuals") (cleaned up), aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 49 F.4th 790 (2d Cir. 2022), and aff'd sub nom. Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 54 F.4th 82 (2d Cir. 2022); Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP, 2018 WL 1627266, at *10 (S.D.N.Y. Mar. 30, 2018) (officer who "reviewed" statement not a maker), corrected, 2018 WL 11472420 (S.D.N.Y. Apr. 27, 2018); cf. In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 949 (E.D. Pa. 1999) (pre-Janus, holding that "[a]llegations that the [relevant defendant] merely held a position on a committee that is responsible for overseeing the corporation's financial or disclosure activities are insufficient under the group pleading doctrine").

And this caselaw is consistent with the Supreme Court's decision in Janus.

In Janus, a company was "significantly involved" in the creation of another entity's financial prospectus.  See Janus, 564 U.S.

12

at 147-48.  The first company "assisted [the second entity] with crafting what [the second entity] said" in the prospectus.  Id. at 148.  And the prospectus was allegedly misleading.  See id. at 147.

But this "significant[]" participation did not do the trick for the plaintiffs.  The first company could not be liable, the Supreme Court held, because its assistance was "subject to the ultimate control of [the second entity]."  Id. at 148.

Janus is not perfectly on point.[14]

But it suggests that "assist[ing]" in crafting a statement --- even being "significantly involved," id. at 148 --- is not the same as being a "maker."  A maker must have "ultimate authority."

In turn, that landing point, on "ultimate authority" as the touchstone, tends to suggest that the above-referenced cases have it right --- that being one voice among many on a review-and-comment disclosure committee does not, standing alone, make a committee member a "maker."  Participating in revising disclosures is not the same as having control over them, let alone "ultimate authority."

To see the point from another angle, look to the analogy the Janus Court leaned on.

When a writer emails a draft speech to the company CEO, and the CEO then delivers it --- it is the CEO who is the maker of the speech, not the speech writer.  See Janus, 564 U.S. at 143.  And this implies that the people on the cc line of the email are not makers, either, if their role is just to read the draft speech and comment on it.  Cf. In re Optimal U.S. Litig., 2011 WL 4908745, at *6 (S.D.N.Y. Oct. 14, 2011) (holding "support professionals," "including auditors [and] lawyers" are not makers).

Now transpose the Supreme Court's analogy to preparation of SEC filings.

Some people put pen to paper on a draft SEC filing.  Without more, they are like speech writers --- and they are not makers.

---

[14] For example, it concerned "involve[ment]," Janus, 564 U.S. at 147-48, by one entity with another, of a kind that reached across the boundary between two legally distinct entities.  See id. at 166-148.

13

See Janus, 564 U.S. at 143.  Some people review and comment on the draft SEC filing.  Without more, they are like the people on the email cc line --- and they, too, are not makers.  See Gavin/Solmonese LLC, 639 F. App'x at 669; In re Turquoise Hill Res. Ltd. Sec. Litig., 625 F. Supp. 3d at 207; Xu, 624 F. Supp. 3d at 360; Menora Mivtachim Ins. Ltd., 2021 WL 1199035, at *28 n.29; Alpha Cap. Anstalt, 2018 WL 1627266, at *10; cf. In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d at 949.  And then someone takes it from there --- and that person, who stands at the end of the road, can potentially be an "ultimate authority" maker under Janus.

Here, all of this is dispositive.

The Chief Operating Officer is said to have been a statement-maker based on his service on the disclosure review committee.  But his role on the committee was apparently just to review and comment.  There is no evidence that he exercised any "control," Janus, 564 U.S. at 142, and so he cannot be a maker.[15]

---

[15]  The gap between participation and control is fundamental to the Janus decision.  See Janus, 564 U.S. at 142-143.  But sometimes that gap can shrink or even close as a practical matter.  Not here, though.  There is, for example, no suggestion that the Chief Operating Officer was a first among equals on the disclosure review committee --- that he exercised especially strong authority over what draft SEC filings making their way through the committee would look like when published.  Cf. Xu, 624 F. Supp. 3d at 361.  And in a similar vein, there is no evidence that those parts of the SEC filings that the Plaintiffs focus on were written by the Chief Operating Officer --- and that whoever penned a part of a disclosure was understood to have "ultimate authority," Janus 564 U.S. at 142, over whether other committee members' comments on it were to be accepted.  Would evidence along these lines have altered the equation?  Maybe, maybe not.  Imagine that a company is a maker of a particular SEC filing (because the filing is made in its name) and the CEO is a maker of the filing (because, say, under relevant state corporate law and company by-laws the CEO has "ultimate authority" over the filing).  But what of the General Counsel?  Can she be a "maker" on a de facto basis --- if she is, for all practical purposes, the final decisionmaker as to the content of the SEC filing?  Cf. Galicki v. New Jersey, 2016 WL 4950995, at *8-11 (D.N.J. Sept. 15, 2016) (discussing de jure versus de facto decision-making power in another context in which the law focuses on who has "final" or "ultimate"

In short: the Defendants' summary judgment motion is granted as to the Chief Operating Officer's asserted liability for statements 8, 9, and 10.  He did not make those statements.

## V. **The Other Individual Defendants**

As noted above, see Part III, the Plaintiffs appear to have abandoned any argument as to liability for the other individual defendants (Curran and Martin) or for the Chief Operating Officer as to statements 1 through 7.

After the Court issues its opinion as to the Company's motion for summary judgment, the Court will then issue an order, allowing the parties to make brief filings on this point, should they wish to.  For example, the Plaintiffs may seek to argue that they have not, in fact, abandoned certain arguments.

This said, it bears noting that establishing liability as to Curran and Martin would seem, at least on a preliminary basis, to be a hard uphill climb.

As to Curran, the main "maker" theory would appear to be that she served on the same disclosure review committee as the Chief Operating Officer.  See Plaintiffs' Letter (May 24, 2024).  But that on-the-committee theory has been rejected here.

And as to Martin, the "maker" theory would seem to be that he may potentially have provided information (a) to the disclosure review committee, or (b) that was expected to make its way to

---

authority).  Janus may have left this question open: at least in a single-entity context, see footnote 14, it did not explicitly discuss the possibility of a disjunct between who those have "ultimate authority" as a formal matter (the CEO in the above example) and those who have "ultimate authority" as a practical matter (the GC in the above example).  Or Janus may in fact have answered the question --- with its focus on pinning the possibility of liability for a public statement on the singular person or entity who publicly "takes credit . . . or blame" for the statement.  Janus, 564 U.S. at 143.  These, though, are questions for another day.  As noted, the Plaintiffs have offered evidence that the Chief Operating Officer had a review-and-comment role as to certain SEC filings --- but no proof that he controlled them.

15

the committee.[16]  That argument would seem weaker than the already-rejected argument that a person becomes a maker by serving on a review committee.  And caselaw appears to suggest that argument would have to clear some real hurdles.  See, e.g., In re Solarcity Corp. Sec. Litig., 274 F. Supp. 3d 972, 1007 (N.D. Cal. 2017) (collecting numerous cases in support of the proposition that "merely acting as the 'source' of allegedly false or misleading information does not mean that such a person had 'ultimate authority' over the statements that were then communicated to the public"); see generally Janus, 564 U.S. at 144-45 (rejecting the argument that "'make' should be defined as 'create,'" resulting in liability for a person "who provides the false or misleading information that another person then puts into the statement") (cleaned up); cf. Noto v. 22nd Century Grp., Inc., 35 F.4th 95, 99, 104 (2d Cir. 2022) (officer who had "some input" in the content of misleading articles published by third party authors did not have "ultimate authority" and thus was not a maker); In re Galectin Therapeutics, Inc. Sec. Litig., 843 F.3d 1257, 1272 (11th Cir. 2016) (similar).

## VI.  Conclusion

The Defendants' summary judgment motion is granted as to defendant Scott Smith's asserted liability for statements 8, 9, and 10, as those statements are listed above in Part III.

The Plaintiffs appear to have abandoned any argument as to liability against the other individual defendants, and as to Smith's liability for statements 1 through 7.  The parties will be given a chance to weigh in on this, after the Court rules on the Defendants' summary judgment motion as to the Company.

\* \* \*

IT IS on this 23rd day of July, 2024, so **ORDERED**.

Michael E. Farbiarz, U.S.D.J.

---

[16] See Cecchi Decl., Ex. 2, Deposition of Martin at 22:12-15; id. at 32:9-13; Cecchi Decl., Ex. 148 at Response Nos. 2 and 3.