UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

In re CELGENE CORPORATION, INC.
SECURITIES LIIGATION

No. 2:18-cv-4772
(MEF)(JBC)

**OPINION and ORDER**

\* \* \*

For the purposes of this Opinion and Order, the Court largely assumes familiarity with the facts and procedural history of this case.

\* \* \*

The lead plaintiff[1] has moved, unopposed, for preliminary approval of a proposed settlement. See Notice of Plaintiff's Unopposed Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement (ECF 479).

The motion is granted, but next steps as to notice and scheduling the approval hearing are held in abeyance for now.

\* \* \*

The parties have litigated this case intensely for more than seven years. See Complaint for Violations of the Federal Securities Laws (ECF 1) at 52; Plaintiff's Letter in Support of Preliminary Approval of Settlement (ECF 481) at 1.

A class was certified. See Order Granting Plaintiff's Motion for Class Certification (ECF 115). Genuinely wide-ranging discovery was taken. See Supplemental Declaration of Matthew L. Mustokoff in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement ("Declaration of Plaintiff's Counsel") (ECF 484-1) ¶ 5. And the parties determined to settle

---

[1] AMF Tjänstepension AB. See Fourth Amended Consolidated Class Action Complaint (ECF 469) at 1. From here, that entity is "the Plaintiff." The various defendants are called "the Defendants."

while they were actively[2] involved in preparation for a trial that was, at the time, around four months away. See id. ¶¶ 5-6, 138.

In short: there is every reason to think that both sides were well attuned to the strengths and weaknesses of their positions when they landed on the proposed settlement.

That tilts in favor of approving the deal they made. See, e.g., In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 537 (3d Cir. 2004) ("Based on the type and amount of discovery undertaken by the parties, the District Court concluded that class counsel adequately appreciated the merits of the case before negotiating, and we agree that this factor strongly favors approval of the settlement."); In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 319 (3d Cir. 1998) (concluding that the "volume and substance of Class Counsel's knowledge of th[e] case [was] unquestionably adequate to support this settlement," and that "class counsel's pursuit of discovery" helped "ensure that [the] proposed settlement [was] the product of informed negotiations") (cleaned up); McGowan v. CFG Health Network, LLC, 2024 WL 1340329, at *7 (D.N.J. Mar. 28, 2024) (approving a class settlement that "was the product of months of negotiations between highly experienced counsel, and after extensive discovery, investigation, and legal analysis"); cf. In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 436-37 (3d Cir. 2016) (concluding that a proposed settlement was presumptively fair where information-gathering was sufficient "for class counsel to assess the value of the class's claims and negotiate a settlement that provides fair compensation" --- even though there had been no formal discovery); see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785, 813-14 (3d Cir. 1995).

\* \* \*

In addition, the parties engaged in what looks to have been arms-length settlement negotiations.

They leaned on the services of well-respected mediators. See Declaration of Plaintiff's Counsel ¶¶ 138-41. They had multiple

---

[2] When the parties agreed to settle, there were 16 fully briefed pre-trial motions before the Court. See Declaration of Plaintiff's Counsel ¶ 133.

mediation sessions --- in 2024, and again in 2025. See id. ¶¶ 140-42. And the proposed settlement here is identical to the double-blind proposal that the mediators issued to the parties, and that the parties separately accepted. See id. ¶ 142.

All of this points toward preliminary approval of the settlement. See In re Gen. Motors Corp., 55 F.3d at 785 (noting that courts look to whether "the negotiations occurred at arm's length" in deciding whether to preliminarily approve a class settlement); In re N.J. Tax Sales Certificates Antitrust Litig., 750 F. App'x 73, 77 (3d Cir. 2018) ("Where negotiations were conducted at arms' length by experienced counsel after adequate discovery, . . . there is a presumption that the results of the process adequately vindicate the interests of the absentees.") (cleaned up) (alteration in original); 4 Herbert B. Newberg & William B. Rubenstein, 4 Newberg and Rubenstein on Class Actions § 13:13 (6th ed. 2025) (similar); see also, e.g., Beneli v. BCA Fin. Servs., Inc., 324 F.R.D. 89, 101 (D.N.J. 2018) (approving a settlement where "substantive arm's length negotiations . . . took place over several months"); In re Warfarin, 391 F.3d at 535 (similar); Bredbenner v. Liberty Travel, Inc., 2011 WL 1344745, at *10 (D.N.J. Apr. 8, 2011) (similar).

* * *

As to the substance of the proposed settlement, the Court has worked through the factors laid out in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), and its progeny,[3] and is satisfied that this is a settlement that it likely could approve. See Hacker v. Elec. Last Mile Sols. Inc., 722 F. Supp. 3d 480, 488 (D.N.J. 2024) (citing Fed. R. Civ. P. 23(e)(1)); see also Newberg and Rubenstein on Class Actions § 13:13 (6th ed. 2025) (explaining that Rule 23(e)(1) authorizes a court to give preliminary approval when it "will likely be able to" give final approval of the settlement).

The proposed settlement here, of $239 million, amounts to around 8.6% of the asserted class-wide damages of $2.78 billion, the

---

[3] Note that the Court has previously conducted a close-in analysis of some of the relevant evidence here. See In re Celgene Corp., Inc. Sec. Litig., 741 F. Supp. 3d 217 (D.N.J. 2024); In re Celgene Corp., Inc. Sec. Litig., 747 F. Supp. 3d 748 (D.N.J. 2024).

top-line recoverable-damages number estimated by the Plaintiff's expert. See Declaration of Plaintiff's Counsel ¶¶ 9, 192.

Each case is different. But 8.6 is not an atypical recovery percentage in securities fraud class actions. See, e.g., In re Wilmington Tr. Sec. Litig., 2018 WL 6046452, at *7 (D. Del. Nov. 19, 2018) (citing data accumulated over 9 years); see also, e.g., Schuler v. Medicines Co., 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (4% recovery "falls squarely within the range of previous settlement approvals"); In re Hemispherx Biopharma, Inc., Sec. Litig., 2011 WL 13380384, at *6 (E.D. Pa. Feb. 14, 2011) (similar, and collecting cases).

And in any event, the haircut here is less dramatic than it first seems, as explained just below.

\* \* \*

Out of the gate, the Plaintiff would face meaningful challenges in seeking to establish at trial that $2.78 billion is the right denominator here.

This is in part because the Defendants' damages expert would be a small shade more likely to get the better of certain arguments than the Plaintiff's damages expert.

First, as to the experts' back-and-forth on whether consistent and inclusive use of analyst reports would tend to show that Otezla was slightly less important to Celgene's overall revenue forecast than the Plaintiff's expert concluded. See Expert Report of Paul A. Gompers (ECF 484-47) ¶¶ 41-44.

Second, as to the debate on whether the Plaintiff's expert fully disentangled (a) the impact of cascading damage to Celgene management's credibility, from (b) the impact of the October 26, 2017 corrective disclosure --- a tough task, in part, because the October 26 corrective disclosure came a week after another disclosure, one that did not concern the drugs at issue here, but that implicated an arguably related execution problem. See id. ¶¶ 65-68.[4]

And third, as to whether a Morgan Stanley corrective disclosure was, in fact, both a disclosure (because of an earlier Jefferies report) and a corrective one (because it was based on a

---

[4] The problem: discontinuance of phase III trials for another important Celgene "pipeline" product.

4

purported need to do studies that Celgene arguably did not in fact need to do). See id. ¶¶ 91-95.

In a nutshell: at trial, there would be risks to the Plaintiff in trying to establish class-wide damages of $2.78 billion --- particularly as to the three issues noted above, which are some of the building blocks of the $2.78 billion number.

\* \* \*

And at trial, what would the likelihood be of a liability finding for the Plaintiff?

Not easy to say with any hard-edged precision. To see why, take for example a key issue that goes to liability --- scienter as to Ozanimod.

Whether that box would be checked for the Plaintiff at trial would in part boil down to a few questions. Were the outside consultants brought in by Celgene given the right information by the company? See Declaration of Plaintiff's Counsel ¶¶ 164-65. Did the consultants genuinely come to certain (relatively optimistic) conclusions? See id. ¶ 166. And did Celgene's senior leaders sincerely rely on those conclusions, and after having kicked the tires to an appropriate extent? See id. ¶¶ 167-71.

Because there is contemporaneous evidence on each side of the ledger,[5] the answers to these questions would likely turn at trial on the jury's evaluation of witness credibility.

That is, the bottom-line outcome on a key liability issue, scienter, would likely swing on how particular witnesses come through on the particular day they are examined and cross-examined, and on how the particular jury that is seated and sworn takes the measure of them.

These are real imponderables --- and therefore real risks to any given party's chance of winning the case.

---

[5] Compare Declaration of Plaintiff's Counsel, Exhibit 34 (ECF 484-36) (July 25, 2017 email from Philippe Martin to Terrie Curran), and Declaration of Plaintiff's Counsel, Exhibit 36 (ECF 484-38) (December 18, 2017 email from Maria Palmisano to Jay Backstrom), with In re Celgene Corp., Inc. Sec. Litig., 741 F. Supp. 3d 217, 221-28 (D.N.J. 2024) (discussing evidence associated with the October 2017 briefing book).

\* \* \*

Where things stand.

As to process, the facts here have been well developed, and the proposed settlement seems to have been struck at arms-length.

And as to substance, the proposed settlement realistically reflects the core risks to the Plaintiff of pushing on to trial --- the risk (a) that the Plaintiff does not win on liability (say, because the jury does not find that there was scienter), and (b) that if the Plaintiff does win on liability, the class-wide damages would be lower to an extent than the number its expert landed on.

In light of this, the Plaintiff's motion for preliminary approval is granted.

\* \* \*

For now, though, the Court will not sign off on the next steps, as to notice (which must be "reasonable" under Rule 23(e)) or scheduling a settlement hearing.  Before then, certain matters must be addressed as to the proposed materials that would be sent off to possible claimants.

Some particular issues.[6]

First, possible objectors to the settlement must be offered, in a hard-to-miss way, a simple method for weighing in --- like email.  See Hacker, 722 F. Supp. 3d at 503-04.

Second, requiring people to register their views 21 days before the settlement approval hearing[7] too-dramatically shortens the window of participation here.

---

[6] And generally, the proposed materials could be markedly shorter and more plain-spoken throughout.  Cf. Webway 360, Inc. v. Xerox Corp., 2025 WL 3161999, at \*4 (D.N.J. Nov. 12, 2025).

[7] As is proposed.  See [Proposed] Order Preliminarily Approving Settlement and Providing for Notice of Settlement ("Proposed Order") (ECF 487-1) ¶¶ 12-13, 15; see also Exhibit 2, Notice of (I) Proposed Class Action Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Notice of Proposed Settlement") (ECF 487-1) at 3.

6

Third, and most fundamentally, the proposed claims form must be substantially modified, so that it provides a smooth and simple way for ordinary retail investors to get paid.

To see why, look to the current proposed form.

\*   \*   \*

The proposed claims form tells potential claimants that if they want to participate in the recovery, they have to pull together confirmatory proof-of-purchase records associated with a "broker."[8]

Per the claims form instructions:

> Documentation may consist of copies of brokerage confirmation slips or monthly brokerage account statements, or an authorized statement from your broker containing the transactional and holding information found in a broker confirmation slip or account statement.  The Parties and the Claims Administrator do not independently have information about your investments in Celgene common stock. IF SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES OF THE DOCUMENTS OR EQUIVALENT DOCUMENTS FROM YOUR BROKER. FAILURE TO SUPPLY THIS DOCUMENTATION MAY RESULT IN THE REJECTION OF YOUR CLAIM. DO NOT SEND ORIGINAL DOCUMENTS.

Exhibit 4, Proof of Claim and Release Form ("Proof of Claim Form") (ECF 487-1) at 3-4 (Part II.6) (underlining added).

But does a person who bought Celgene through the Robinhood app or via Webull think of Robinhood or Webull as their "broker"?

Maybe not.  To see the point, look, for example, to an article now up on the SoFi website, called Buying Stocks Without a Broker.  See Rebecca Lake, Buying Stocks Without a Broker, SoFi (Feb. 25, 2025), https://www.sofi.com/learn/content/buying-stocks-without-broker/ (last visited Dec. 4, 2025).

It has a section titled "How to Buy Stocks Online Without a Broker."  Id.  And that section indicates that people looking for the buy-without-a-broker option might turn to an "online

---

[8]  See Exhibit 4, Proof of Claim and Release Form (ECF 487-1) at 3-4 (Part II.6); see also Notice of Proposed Settlement at 14 (¶ 66).

7

brokerage account." Id.  The necessary premise of this is that an "online brokerage account" does not count as a "broker."

That may well be how a good many people understand things.[9]

And if a person who bought shares via an online trading platform understands things in that way, how will he respond to the Plaintiff's proposed claims form?

Likely by concluding that there is no real way for him to share in the settlement, because, he thinks, he did not buy through a "broker" and therefore cannot put hands on back-up information from a "broker."

There may be any number of ways to address this issue.

For example, the claims form does not currently define "broker." It could.  And it does not say anything about the status of online trading platforms, or include illustrative examples of companies that count as brokers.  But it could do that, too. Plugging those holes might help to clear things up.

And it also might help if the claims form made use of some generic terms, not connected to "broker," to describe the sort of documentation a claimant can put in to show she was invested in Celgene during the relevant period.[10]

Or the claims form might directly address whether app users can send in a screen cap as the relevant record.

---

[9]  The reason why is not hard to see.  In everyday English, a broker is often thought of as a person who places orders.  See, e.g., Broker, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/broker (last visited Dec. 4, 2025) ("someone who acts as an intermediary") (emphasis added).  And that can seem at odds with the idea that an app might be a "broker."  To be sure, the legal meaning of "broker" may be different.  It can often include not just people, but entities --- including entities that operate trading platforms.  But for class notice to work, people need to be reached where they are, and everyday meanings loom larger than legal ones.

[10]  Account statement, activity report, transaction report, investment report, trade report, transaction history, trade history, etc.

8

But all of these are only possibilities for the Plaintiff to consider around the bend. For now, the proposed claims form does not measure up.

\*   \*   \*

Take another difficulty with the proposed claims form.

The first line on the form asks for information about the "Beneficial Owner." Proof of Claim Form at 2.

But many retail investors will not know what that means. If someone bought individual shares through E*Trade, who is the beneficial owner?

At first glance, Part II.1 of the proposed claims form appears to suggest where to find the answer. The definition of "beneficial owner" seems like it will be in a long, stand-alone form. See Proof of Claim Form at 3 (directing class members to the settlement notice for definitions of "many" capitalized terms, of which "Beneficial Owner" is sometimes one).

But "beneficial owner" is not defined in the stand-alone form. And the part of the proposed claims form that looks like it could provide insight, see id. at 4 (Part II.8), is not helpful enough. It speaks of "beneficial owner(s)" by contrast with "record owner[s]" and "nominee[s]" --- more terms that retail investors may not know. Id.

Other examples of difficulties in the proposed claims form.

First, here-and-there bolt-ons[11] threaten to distract focus from what matters, as does the overall length of the form.

Second, the proposed claims form seems to sometimes require complicated special permission to submit certain materials electronically,[12] but then four pages earlier suggests that permission is not needed. Compare id. at 5 (Part II.16), with id. at 1.

---

[11] One example, among others: an unnumbered paragraph in all-caps and bold is labelled "**IMPORTANT**"; it covers what to do if, among other things, a postcard does not come back within 60 days. See Proof of Claim Form at 5.

[12] The content of the website that has been created for this case has not been provided to the Court.

9

And third, a critical piece of information --- the email address of someone who can presumably help fill out the claims form --- is especially hard to find.  It is inside item 15 in a multi-page list of 16 different instructions, and is not marked in any way, even as many other parts of the form are bolded or underlined, most of which are not especially important.

Examples could be multiplied.  But there is no need, now, to go further.

\*   \*   \*

A user-friendly claims form makes it obvious from the get-go that the form will be both very easy and very quick to fill out.  It directly addresses plainly relevant questions, and in straightforward, everyday language.  It finds ways to actively encourage recipients of the form to fill it out and get it in.

But if what comes in the mail is too complicated or too hard to follow --- many people will simply stall out and give up.  If so, the claims form may well end up in the garbage --- especially for people who did not own too much stock anyway, and who therefore imagine that their recovery will be small, such that it is not worth the time to try to work things through.

The end result may be that distribution plans that are fair and even-handed on their face will nonetheless yield recoveries that, in practice, do not run to as many small-scale individual investors as they should.[13]

There is a balance to be struck when it comes to communications to the class.  If they are too expensive to put together, that can whittle away at the class's overall recovery.  But more needs doing in this case, and that is a task for the Plaintiff to take on.[14]

---

[13] And another possible result: a final settlement-approval hearing at which the Court gets a skewed understanding of shareholders' responses to the settlement.  See Hacker, 722 F. Supp. 3d at 505 n.35 (explaining).

[14] The Court will not now prescribe how the claims form must look, even as the materials filed by the Plaintiff seem to envision that possibility.  The Plaintiff's lawyers have deep expertise in this area, as well as strong incentives to ensure a sufficiently broad recovery here.  See Hacker, 722 F. Supp. 3d at 505-06.

10

The Plaintiff shall file appropriately modified materials.[15]

\* \* \*

IT IS on this 5th day of December, 2025, SO ORDERED.

_____
Michael E. Farbiarz, U.S.D.J.

---

[15] In doing so, the Plaintiff shall indicate whether there is any need for the relevant materials to include information regarding where non-English speakers might go for assistance.